Mario NIEMAN, Plaintiff-Appellee,

v.

DRYCLEAN U.S.A. FRANCHISE COMPANY, INC., Defendant-Appellant.

No. 97-4745.

United States Court of Appeals,

Eleventh Circuit.

June 21, 1999.

Appeal from the United States District Court for the Southern District of Florida. (No. 95-1390-CIV-WDF), Wilkie D. Ferguson, Jr., Judge.

Before TJOFLAT and DUBINA, Circuit Judges, and SMITH[*], Senior Circuit Judge.

SMITH, Senior Circuit Judge:

Dryclean U.S.A. Franchise Company, Inc. (DUSA) appeals the March 26, 1997 decision of the U.S. District Court for the Southern District of Florida, granting summary judgment to Mario Nieman.[1] Nieman sued DUSA for return of a $50,000 nonrefundable deposit, on the basis that DUSA failed to make certain disclosures required by the Federal Trade Commission's Franchise Rule, 16 CFR § 436.1 (1998). DUSA defended on the ground that the Franchise Rule does not apply to foreign transactions such as that between DUSA and Nieman. The district court held that the Franchise Rule applied extraterritorially and therefore Nieman was entitled to refund of his deposit. We reverse.

*Facts and Proceedings Below*

This case arises out of negotiations between DUSA and Nieman, an Argentine citizen,[2] concerning the possible opening of drycleaning franchises in Argentina. Nieman sought a master franchise agreement

---

[*]Honorable Edward S. Smith, Senior U.S. Circuit Judge for the Federal Circuit, sitting by designation.

[1]Nieman's name is spelled "Neiman" on some documents in the record. We use the spelling used in Appellee's brief, the original complaint, and the judgment below.

[2]Nieman was negotiating as part of a group of Argentine businessmen but only Nieman is involved in this appeal.

which would give him the right to sell franchises throughout Argentina. In February 1994, the parties executed a letter agreement. Nieman signed the agreement in Argentina, then mailed it back to DUSA in Florida, where DUSA's representative signed it. Under the terms of the agreement, Nieman gave DUSA a $50,000 non-refundable deposit in exchange for DUSA's agreement not to negotiate with others regarding the Argentine master franchise agreement for sixty days. In effect, Nieman bought a sixty-day option to purchase the master franchise agreement.

Nieman intended to use the sixty-day period to arrange financing, but ultimately failed to raise the necessary capital. DUSA kept the non-refundable deposit and Nieman sued for its return under the Florida Deceptive and Unfair Trade Practices Act (DUTPA), FLA. STAT. ANN. §§ 501.201 to 501.211 (West 1994). The basis of Nieman's suit was that DUSA had failed to make the disclosures required under the DUTPA and under the Federal Trade Commission (FTC) Franchise Rule, 16 CFR § 436.1 (1998). DUSA defended on the ground that the DUTPA and the Franchise Rule do not apply because this transaction took place in Argentina and the DUTPA and the Franchise Rule have no extraterritorial application.[3] DUSA did not dispute that it failed to make the relevant disclosures.

Both parties moved for summary judgment. On March 26, 1997, the District Court for the Southern District of Florida granted summary judgment to Nieman. The court held that the DUTPA applied to this transaction because "Congress has the power to prevent unfair trade practices in foreign commerce by citizens of the United States, although some acts are done outside the territorial limits of the United States." The court ordered DUSA to refund the full amount of Nieman's $50,000 deposit. DUSA appeals.

*Standard of Review*

Our review of a trial court's grant of summary judgment is plenary. *Hale v. Tallapoosa County,* 50 F.3d 1579, 1581 (11th Cir.1995). We apply the same standard applied by the district court. *Rodgers v. Singletary,* 142 F.3d 1252 (11th Cir.1998).

---

[3]DUSA also argued that Nieman lacked standing to sue under the DUTPA because that law was intended to protect consumers, not sophisticated businessmen like Nieman. The district court held that Nieman had standing. Because we conclude that the DUTPA and the Franchise Rule do not apply extraterritorially, we do not reach the standing issue.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). Here, the relevant facts are not in dispute. The only dispute concerns the extraterritorial application of the Florida DUTPA and, through it, the FTC Franchise Rule.

### Extraterritorial Application of the FTC Franchise Rule

The Florida DUTPA defines a violation of that law to include violations of rules promulgated pursuant to the Federal Trade Commission Act. *See* FLA. STAT. ANN. § 501.203(3)(a) (West 1994). The FTC Franchise Rule was promulgated pursuant to the Federal Trade Commission Act, 15 U.S.C. § 41 et seq. *See* 16 CFR § 436 (1998). The DUTPA also creates a private cause of action where none exists under federal law. FLA. STAT. ANN. § 501.211 (West 1994). Thus, under the DUTPA, a U.S. franchisee could sue a Florida franchisor such as DUSA for violating the Franchise Rule.

However, in order to provide a basis for a *foreign* franchisee to sue in regard to a *foreign* franchise deal, the Franchise Rule would have to apply extraterritorially.[4] An agency regulation has the force and effect of law only if it is authorized by congressional grant of authority; it is therefore subject to limitations imposed by Congress. *Chrysler Corp. v. Brown,* 441 U.S. 281, 302, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979). The Franchise Rule was promulgated by the FTC under the authority of the Federal Trade Commission Act. Thus, for the Franchise Rule to have extraterritorial application, Congress must have intended the FTC Act to apply extraterritorially.

It is undisputed that Congress has the power to regulate the extraterritorial acts of U.S. citizens. Whether Congress has chosen to exercise that authority, however, is an issue of statutory construction. "It

---

[4]Nieman argues that extraterritorial application of the Franchise Rule is unnecessary in this case because "most if not all of the pertinent conduct subject to regulation occurred in Florida." Nieman argues that DUSA's status as a Florida corporation doing business in Florida should make the DUTPA applicable regardless of the location of the prospective franchisee. We do not find this argument persuasive. In the negotiations which culminated in payment of the deposit, and which omitted the disclosures required by the Franchise Rule, DUSA negotiated with Argentine citizens, in Argentina, concerning an Argentine franchise system. Under the circumstances of this case, if the Franchise Rule is to apply at all, it must apply extraterritorially.

is a longstanding principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.' " *EEOC v. Arabian Am. Oil Co.,* 499 U.S. 244, 248, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991) (quoting *Foley Bros., Inc. v. Filardo,* 336 U.S. 281, 285, 69 S.Ct. 575, 93 L.Ed. 680 (1949)). This presumption "is based on the assumption that Congress is primarily concerned with domestic conditions." *Foley Bros.,* 336 U.S. at 285, 69 S.Ct. 575. It also "serves to protect against unintended clashes between our laws and those of other nations which could result in international discord." *Arabian Am. Oil Co.,* 499 U.S. at 248, 111 S.Ct. 1227 (citing *McCulloch v. Sociedad Nacional de Marineros de Honduras,* 372 U.S. 10, 20-22, 83 S.Ct. 671, 9 L.Ed.2d 547 (1963)).

Mere boilerplate language in a statute is insufficient to overcome this presumption. The Supreme Court has "repeatedly held that even statutes that contain broad language in their definitions of 'commerce' that expressly refer to 'foreign commerce' do not apply abroad." *Arabian Am. Oil Co.,* 499 U.S. at 251, 111 S.Ct. 1227. The presumption against extraterritoriality can be overcome only by clear expression of Congress' intention to extend the reach of the relevant Act beyond those places where the United States has sovereignty or has some measure of legislative control. *See id.* at 248, 111 S.Ct. 1227.

The courts "assume that Congress legislates against the backdrop of the presumption against extraterritoriality." *Id.* Congress' awareness of the need to make a clear statement of extraterritorial effect is confirmed by the many statutes that explicitly refer to extraterritorial application. *See, e.g.,* the Biological Weapons Anti-Terrorism Act of 1989, 18 U.S.C. § 175(a) (1994) ("There is extraterritorial Federal jurisdiction over an offense under this section committed by or against a national of the United States.").

The FTC Act provides that "unfair or deceptive acts or practices in or affecting commerce[ ] are hereby declared unlawful." 15 U.S.C. § 45(a)(1) (1994). The Act defines "commerce" to mean "commerce among the several States or with foreign nations." 15 U.S.C. § 44 (1994). Based upon these passages, Nieman argues that the Act applies in this case; viz., that by defining commerce to include foreign commerce, Congress showed that it intended the FTC Act to apply extraterritorially.

Nieman cites *Branch v. FTC,* 141 F.2d 31 (7th Cir.1944), to support his position. In *Branch,* the Seventh Circuit held that the FTC Act authorized the Federal Trade Commission to exercise jurisdiction over a U.S. correspondence school that made fraudulent representations to its Latin American customers. *Id.* at 35.

*Branch* does not support the exercise of authority by the FTC in this case. The court in *Branch* concluded that the FTC had jurisdiction to regulate the school's conduct with respect to foreign customers based on the effect on *domestic* competition. *See id.* at 34-35 ("The action of the Federal Trade Commission was aimed at compelling the petitioner to use fair methods in competing with his fellow countrymen. It was an attempt to eliminate the unfair, fraudulent, and deceptive practices of the petitioner from a field already occupied by several firms and potentially open to more.... The Federal Trade Commission does not assume to protect the petitioner's customers in Latin America. It seeks to protect the petitioner's competitors from his unfair practices.").

Thus, the *Branch* court found a basis for FTC jurisdiction based on the effect of the unfair trade practices on domestic competition, not on foreign customers. Here, by contrast, there is no evidence that DUSA's non-disclosure affected domestic competition in any way.

It is true that the *Branch* court concluded that the FTC Act authorizes extraterritorial exercise of the FTC's unfair competition jurisdiction, which includes the Franchise Rule. However, *Branch* is not the law of this circuit and is therefore persuasive authority at best. In view of subsequent Supreme Court decisions, we disagree with the *Branch* court's statutory analysis.

Rather, we agree with DUSA that the language of the FTC Act does not clearly indicate that Congress intended the Act to apply extraterritorially. The provisions in the FTC Act that Nieman points to as supporting extraterritorial application of the Act are at best ambiguous and, more importantly, are virtually identical to those that the Supreme Court found *not* to support extraterritorial application of Title VII of the Civil Rights Act of 1964. *See Arabian Am. Oil Co.,* 499 U.S. at 249-251, 111 S.Ct. 1227: Title VII stated that it applied to employers "engaged in an industry affecting commerce;" "commerce" being defined as

"trade ... among the several States;  or between a State and any place outside thereof."  The Court rejected the argument that these definitions were broad enough to support extraterritorial application.  "The language relied upon by petitioners—and it is they who must make the affirmative showing—is ambiguous, and does not speak directly to the question presented here.  The intent of Congress as to the extraterritorial application of this statute must be deduced by inference from boilerplate language which can be found in any number of congressional Acts, none of which have ever been held to apply overseas."  *Id.* at 250-251, 111 S.Ct. 1227.

Title VII applied to employers "engaged in an industry affecting commerce," 499 U.S. at 249, 111 S.Ct. 1227, while the FTC Act declares unlawful unfair practices "in or affecting commerce," 15 U.S.C. § 45(a)(1).  Title VII defined commerce as "trade ... among the several States;  or between a State and any place outside thereof," 499 U.S. at 251, 111 S.Ct. 1227, while the FTC Act defines commerce as "commerce among the several states or with foreign nations," 15 U.S.C. § 44.  Given the similarity of these definitions, the scope of the statutes should be interpreted similarly.  Thus, the Supreme Court's holding in *Arabian American Oil Co.* compels us to conclude that Congress did not intend the similarly worded unfair trade provisions of the FTC Act to apply extraterritorially.  We therefore hold that the FTC Act does not authorize extraterritorial application of the Franchise Rule.

Further, even if Congress intended the unfair trade provisions of the FTC Act to give the FTC the authority to apply regulations extraterritorially, the evidence does not suggest that the FTC exercised such authority.  Rather, the evidence shows that the FTC did not intend its Franchise Rule to apply to a U.S. franchisor in its dealings with foreign franchisees with respect to franchises to be located in a foreign country.

First, the Franchise Rule was not intended to protect franchisees in foreign countries.  When it was promulgated, the Rule was accompanied by a Statement of Basis and Purpose that reviewed the history of franchising in the United States and discussed measures that had been taken by various U.S. federal agencies and state governments to address unfair franchising practices.  *See* 43 Fed.Reg. 59,621, 59,623-59,624 (1978).  The Statement of Basis and Purpose is silent regarding the history or problems of franchising in other countries.

Second, the provisions of the Rule itself reveal a purely domestic focus. For example, the rule addresses potential conflicts with state law but does not mention foreign law. *See, e.g.,* 16 CFR § 436.1(a)(21) (disclosure statement shall not contain information "other than that required by this part or by State law not preempted by this part"). Also, the Rule mandates a cover sheet that directs prospective franchisees to consult appropriate state agencies but does not mention foreign governmental agencies. *See* 16 CFR § 436.1(d)(1) (cover sheet must state that "[t]here may also be laws on franchising in your State. Ask your State agencies about them.").

Third, the FTC has never indicated that the Franchise Rule was intended to apply to foreign franchisees. For example, the Final Interpretive Guides devote a section to potential conflicts between the Franchise Rule and state and local laws, but are silent with regard to foreign laws. 44 Fed.Reg. 49,966, 49,971 (1979).

Finally, the FTC recently issued an Advance Notice of Proposed Rulemaking, proposing to modify the Rule to "clarify" that it does not apply to the sale of franchises to be located outside the United States. *See* 62 Fed.Reg. 9115, 9119 (1997); 62 Fed.Reg. 28,822, 28,823 (1997). Although the FTC has not issued a formal modification of the Franchise Rule, the Federal Register notices are evidence that extraterritorial application of the Rule was not contemplated at the time it was promulgated.

*Conclusion*

We have considered Appellee's other arguments for extraterritorial application of the Franchise Rule but find them to be without merit. For the reasons explained above, the Franchise Rule does not apply to the transaction between DUSA and Nieman. Therefore, DUSA's failure to comply with the disclosure requirements of the Franchise Rule does not provide Nieman with a cause of action to seek refund of his non-refundable deposit. Nieman asserted no other basis on which to recover his deposit. The district court therefore erred in granting summary judgment to Nieman. The judgment of the district court is reversed.

REVERSED.