Troy DETERRA Plaintiff

v.

AMERICA WEST AIRLINES,
INC. Defendant

No. 99–12266–LPC.

United States District Court,
D. Massachusetts.

Sept. 4, 2002.

Carlin J. Phillips, Gogel, Phillips & Garcia, N. Dartmouth, Kenneth J. Gogel, Gogel, Donoghue & Gogel, Boston, Andrew J. Garcia, Phillips & Garcia, LLP, North Dartmouth, MA, for Troy Deterra, Plaintiff.

Sherry Y. Mulloy, Meehan, Boyle, Black & Fitzgerald, P.C., Peter J. Black, Mee-

han, Boyle, Black & Fitzgerald, Boston, MA, for America West Airlines, Inc., Defendant.

### MEMORANDUM AND ORDER ON MOTION FOR SUMMARY JUDGMENT

LAWRENCE P. COHEN, United States Magistrate Judge.

This is an action in which the plaintiff alleges that he was discriminated against by the defendant on account of a handicap. In Count I of the complaint, plaintiff seeks compensatory damages under the Air Carrier Access Act (hereinafter "ACAA").[1] In Count II, plaintiff seeks punitive damages under the ACAA. In Count III, plaintiff seeks compensatory damages for a common law breach of contract. Counts IV through VI are pendent state law tort claims (Count IV alleges negligence, Count V alleges intentional infliction of emotional distress, and Count VI[2] alleges negligent infliction of emotional distress). The above-entitled case was referred to this court for all proceedings, including trial and entry of judgment, with the consent of the parties and consistent with the provisions of 28 U.S.C. § 636(c) and Rule 4(c)(1) of the Rules for United States Magistrate Judges in the United States District Court for the District of Massachusetts.

Defendant has filed a Motion for Partial[3] Summary Judgment Pursuant to Fed. R.Civ. P 56 (# 32). By Memorandum and Order and Procedural Order (# 41) dated March 28, 2002, this court entered a Memorandum and Order allowing that motion for summary judgment vis a vis the pendent state law claims for the reasons set forth in that Memorandum and Order and Procedural Order (# 41). By the terms of that same order, this court scheduled a hearing on that motion vis a vis the remaining counts (Counts I and II) of the complaint, to wit: plaintiff's claim for compensatory damages under the ACAA. (Count I), and plaintiff's claim for punitive damages under the ACAA (Count II).[4] That hearing was held on April 18, 2002.

### I. General Undisputed Facts

For purposes of defendant's Motion for Summary Judgment, this court finds the

---

1. In his complaint, plaintiff references the ACAA to Title 49, United States Code, Section 1374(c). The ACAA, however, has been recodified as Title 49, United States Code, Section 41705.

2. In his complaint, plaintiff pleads the latter two claims as Count V. In this Memorandum and Order, however, this court refers to the intentional infliction of emotional distress claim as Count V, and the negligent infliction of emotional distress claim as Count VI.

3. The motion was originally filed as one for partial summary judgment. Since the preparation of the Memorandum and Order and Procedural Order, defendant has filed a corrected motion which makes clear that the motion is not for partial summary judgment, but for judgment as to all claims.

4. In the Memorandum and Order entered by this court on March 20, 2002, this court left open the matter of punitive damages request set forth in Count II, since that matter would be moot if plaintiff could not make out a claim under Count I.

At the oral argument, this court expressed a view, but did not finally rule, that, even if plaintiff could show a violation of the ACAA, the conduct upon which plaintiff relied surely did not measure up to that sort of conduct warranting an award of punitive damages in addition to compensatory damages.

Since oral argument, it is clear to this court that, even if plaintiff could make out a violation of the ACAA warranting compensatory damages, he would not be entitled to punitive damages. And that is because the Supreme Court, on June 17, 2002, ruled unequivocally that a punitive damages award is not authorized for handicap discrimination. Although that ruling was made in the context of the ADA, it is clear that that ruling applies with equal force to a claim brought under the ACAA.

following facts to be undisputed: [5]

1. As of August 7, 1999, plaintiff was wheelchair-bound due to a degenerative neuro-muscular disorder which rendered him a paraplegic;

2. Together with his brother Daniel Deterra and sister-in-law, Catherine Deterra, plaintiff had reservations to travel on an America West flight to Boston, Massachusetts scheduled to depart from Las Vegas, Nevada at approximately 11:30 p.m. on August 7, 1999;

3. When plaintiff entered the ticket line at the Las Vegas Airport on August 7, 1999, to check in for his flight, plaintiff waited in line in his wheelchair for over an hour. He was not advanced to the front of the ticket line by America West as had occurred in Boston; [6]

4. Plaintiff arrived at the gate for boarding his flight at least 35 minutes before the flight's scheduled departure. At that time, the boarding of first class passengers from the terminal through the jetbridge, the tunnel-like structure leading from the terminal to the aircraft, had already begun; [7]

5. Plaintiff attempted to communicate with the America West gate agents after they refused to stop the line to allow Plaintiff to board. He tried to tell the gate agents that he had to board first, because it would be too difficult to board him with all other passengers on the plane, but they ignored him, would not answer him and would not look directly at him. Instead of talking to him, they looked over him and talked to his brother and sister-in-law.

6. When plaintiff's brother, Daniel, asked an America West agent named Jay to allow plaintiff to go to the front of the line and board ahead of the other passen-

---

**5.** Where the plaintiff, in his Plaintiff's Statement of Material Facts of Record Presenting Genuine Issues to Be Tried (# 37), has agreed to the statement of undisputed material facts as presented by defendant in its Statement of Undisputed Material Facts and Facts Accepted as True for Purposes of This Motion (appended to # 33), this court has set forth those undisputed facts as stated by the defendant.

**6.** In his initial memorandum in opposition to defendant's motion for summary judgment (# 38, p. 14), plaintiff generally complained about the fact that he was not advanced to the front of the ticket line. There is nothing, however, in the record which suggests that plaintiff ever requested to be advanced to the front of the ticket line, or, indeed, that any representative of the defendant was aware that he was waiting in line. Plaintiff has not proffered anything by way of authority or otherwise which suggests that the ACAA requires airlines to advance handicap passengers to the fronts of a ticket line. To the contrary, Department of Transportation Regulations suggest that it is, in fact, discriminatory under the ACAA to require a handicap person to accept special services or treatment. *See* 14 C.F.R. § 382.7(a)(2)("A carrier shall not, directly or through contractual, licensing,

or other arrangements... Require a individual with a disability to accept special services (including, but not limited to, preboarding) not requested by the passenger.")

In any event, at the hearing before this court on the motion for summary judgment, plaintiff limited his claims to those set forth in the text below, and does not claim discrimination under the ACAA on account of the fact that he was not advanced to the front of the ticket line.

**7.** In its statement of undisputed facts, defendant says that general boarding had begun when plaintiff arrived at the departure gate. Plaintiff, in turn, says that general boarding had not yet begun when he arrived at the departure gate, *see* Plaintiff's Statement of Material Facts of Record Presenting Genuine Issues to Be Tried (# 37, ¶ 7), but has also stated (Answer to Interrogatory No. 16, third full paragraph Exhibit 2 to defendant's Memorandum of Law in support of its motion for summary judgment (# 33)) that first class boarding had already begun. For purposes of the motion for summary judgment, this court assumes that only first class passengers were boarding when he arrived at the departure gate.

gers, Jay responded that they would need to wait until after the other passengers had boarded. In particular, according to plaintiff's brother, Daniel, when he and his wife and the plaintiff went to the counter in the gate area, they were told "We've already started boarding the people. It will have to be later. It will have to be done at the end." Deterra was not initiating any conversation with the airline personnel.[8]

7. Plaintiff and/or his relatives disagreed with America West's response. Catherine Deterra claims that she asked to speak to a supervisor, was told by an America West agent named Robert that there was no supervisor available, and he gave her a telephone number to contact. She claims that she was told by the woman she spoke to at that number that the woman was "dismayed" at what was happening but that there was no one available to resolve the problem due to the late hour.

8. After it appeared that the other passengers had entered the jetbridge to board, Daniel Deterra addressed the America West employee who was standing in the gate area nearby and who had told them they would have to wait, saying "Are you fucking assholes ready to board him now?" Daniel Deterra admits that he was very upset and might have been mad when he made this remark. He admits that he said it "a little louder than normal" and in a "perturbed voice."

9. Wayne DeMello, a friend traveling with the Deterras, recalls that when the group arrived at the gate to board the flight, other passengers were already boarding through the jetbridge and he heard one of the America West agents tell Daniel Deterra that they would have to wait and board last. He recalls that Daniel Deterra was loud and swore, and that DeMello told Daniel he wasn't supposed to be loud and told him, "you can't say that here." He told Daniel Deterra to calm down because there was no need for him to be screaming.

10. Plainitff and Daniel Deterra both admit that if Daniel Deterra had not acted in the manner set forth in Paragraphs I.8 and I.9 above, plaintiff, his brother and sister-in-law could have boarded their original flight after the other passengers had boarded.

11. According to plaintiff, the America West agents indicated that Daniel Deterra's words were too forceful and that plaintiff, his relatives, and the two friends with them, would not be allowed to board the flight.

12. Plaintiff's brother immediately apologized to both gate agents, Jay and Robert, for his remarks. (See Exhibit 3, Excerpts from Daniel Deterra Deposition, pp. 70, 72, 74.) Robert stated that he understood Daniel Deterra's frustration regarding the boarding situation.

13. After general boarding had been completed, the gate agents advised plaintiff that he and his sister-in-law, Catherine, would be permitted to board the flight, but that plaintiff's brother, Daniel, would not be permitted to board that flight.[9] Believ-

---

**8.** Plaintiff's sister-in-law, Catherine Deterra, described the conversation as follows:
> ...when she told one of the America West agents at the gate that "He (Deterra) needs to get on so that we can get him safely into the chair," the agent said "It's going to have to wait until last." She also recalls that when she complained that she could not believe they were not going to be able to board, the agent said "We can't handle it now" and "Look, it's going to have to wait until last."

**9.** At the hearing, plaintiff did not contend that the airline agents acted improperly in refusing boarding to plaintiff's brother, Daniel, on account of that set forth in Paragraphs I.8 and I.9.

ing that he needed the assistance of his brother, Daniel, plaintiff chose not to take that flight. All three—plaintiff, Daniel Deterra, and Catherine Deterra, were rebooked for the next flight at 12:40 p.m., and they took that flight, arriving in Boston about three hours later than they would have had they been boarded on the original flight.[10]

## II. *Plaintiff's Claims*

As set forth above, notes 6 and 10, *supra*, plaintiff does *not* contend that he was denied a reasonable accommodation under the ACAA on account of the fact that he had a long wait in the ticket line when he first arrived at the airport, or that he was denied a reasonable accommodation on account of the fact that he took the next flight out which arrived three hours later. Instead, he contends, as argued by counsel for plaintiff at the hearing on the motion for summary judgment, that he was denied a reasonable accommodation within the meaning of the ACAA only on account of the following: (1) because airline agents "talked over the plaintiff" directly to plaintiff's brother, Daniel; (2) because airline agents treated plaintiff in a humiliating and derogatory fashion by referring to him, on account of his handicap, as an "It"; and (3) because the airline did not have a "complaint resolution officer" present when the incident at the boarding area arose.

## III. *Summary Judgment Standard*

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett,*

477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)(quoting Fed.R. Civ. P. 1).

To survive a motion for summary judgment, the opposing party must demonstrate that there is a genuine issue of material fact requiring a trial. Fed.R.Civ. P., 56(e); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). As the Supreme Court recently has made clear, the standard for granting summary judgment "mirrors" the standard for a directed verdict under Fed.R.Civ.P. 50(a). *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). That is, the inquiry focuses on "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. 2505. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348 (citing *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)).

A plaintiff may not obtain a trial merely on the allegations in its complaint, *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 289–290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968), or by showing that there is "some metaphysical doubt as to the material facts," *Matsushita, supra,* 475 U.S. at 586, 106 S.Ct. 1348 (citations omitted). Where the non-moving party will bear the burden of proof at trial, Rule 56(c) mandates the entry of summary judgment against that party where it "fails to make a showing sufficient to establish the existence of an element essential to

---

10. Inasmuch as plaintiff would have been permitted to board the original flight had he chosen to be boarded at that time, plaintiff, at the hearing before this court, specifically eschewed any claim that he was denied boarding on the original flight.

that party's case...." *Celotex Corp. v. Catrett,* 477 U.S. at 322, 106 S.Ct. 2548. That is to say, to avoid summary judgment, the opposing party "...must produce at least some evidence *reasonably* affording an inference supporting the existence of a triable issue of fact [with respect to the element which the opposing party must establish at trial]." *Santiago, et al. v. Group Brasil, Inc.,* 830 F.2d 413, 416 (1st Cir.1987).

## IV. *Discussion*

In the circumstances, *vis a vis* the three claims asserted by the plaintiff as indicated in Part II above, this court finds and concludes that plaintiff cannot, on the basis of the undisputed material facts, make out a triable claim under the ACAA (Count I).

### 1. *The "Talking Over Plaintiff's Head" Claim*

■ As indicated above, plaintiff contends that agents of the defendant airline denied plaintiff a reasonable accommodation by "talking over his [plaintiff's] head" and directing their remarks to plaintiff's brother, Daniel, instead of to the plaintiff.

In this court's view, this conduct, standing alone, does not constitute prohibited discrimination within the meaning of the ACAA.

The ACAA provides:

§ 41705. Discrimination against handicapped individuals

(a) In general.—*In providing air transportation,* an air carrier, including (subject to section 40105(b)) any foreign air carrier, may not discriminate against an

otherwise qualified individual on the following grounds:

(1) the individual has a physical or mental impairment that substantially limits one or more major life activities.

(2) the individual has a record of such an impairment.

(3) the individual is regarded as having such an impairment. (Emphasis added).

Beyond the plain words of the statute, there is little legislative history surrounding the enactment of the ACAA—at least in terms of defining its scope. One court, however, has appropriately interpreted the ACAA as follows (*Rivera v. Delta Air Lines, Inc.,* 1997 WL 634500 * 7 (E.D.Pa. 1997)):

The ACAA prohibits air carriers from discriminating against an individual because they have, or are regarded as having, a disability. The regulations promulgated in connection with the ACAA explain that the Act requires air carriers: (1) to provide *services and benefits* without discrimination on the basis of disability; and (2) to provide disabled individuals with certain services, equipment or assistance. 14 C.F.R. §§ 382.7, 382.39 (1996). In other words, all persons are entitled to be treated equally, but "qualified handicapped individuals" are further entitled to certain services. (Emphasis added).

In this case, plaintiff makes no argument that he was denied those certain services, equipment or assistance, beyond those provided to all travelers, specifically referred to in the implementing regulations.[11] And nothing in the implementing

---

**11.** The implementing regulations specifically set forth certain accommodations which must be provided to qualified handicapped travelers. Section 382.21 of Title 14 of the Code of Federal Regulations (referred to as *Special Regulations* ), provides in pertinent part:

§ 382.21 Aircraft accessibility.

\* \* \* \* \* \*

(1)(i) Aircraft with 30 or more passenger seats on which passenger aisle seats have armrests shall have movable aisle armrests on at least one-half of passenger aisle seats. (ii) Such armrests are not required to be provided on aisle seats on which a movable

regulations suggest that qualified handicapped individuals should or must be boarded before all other boarders, or, at any particular time. Indeed, to the extent that the implementing regulations refer to boardings of aircraft at all, the implementing regulations suggest to the contrary—that is, that it *is* discriminatory to pre-board qualified handicapped individuals as a matter of policy.[12]

armrest is not feasible or aisle seats which a passenger with a mobility impairment is precluded from using by an FAA safety rule. (iii) For aircraft equipped with movable aisle armrests as required by this paragraph, carriers shall configure cabins, or establish administrative systems, to ensure that an individuals with mobility impairments or other individuals with a disability can readily obtain seating in rows with movable aisle armrests.

(2) Aircraft with 100 or more passenger seats shall have a priority space in the cabin designated for stowage of at least one folding wheelchair;

(3) Aircraft with more than one aisle in which lavatories are provided shall include at least one accessible lavatory. This lavatory shall permit a qualified individual with a disability to enter, maneuver within as necessary to use all lavatory facilities, and leave, by means of the aircraft's on-board wheelchair. The accessible lavatory shall afford privacy to persons using the on-board wheelchair equivalent to that afforded ambulatory users. The lavatory shall provide door locks, accessible call buttons, grab bars, faucets and other controls, and dispensers usable by qualified individuals with a disability, including wheelchair users and persons with manual impairments;

(4)(i) Aircraft with more than 60 passenger seats having an accessible lavatory, whether or not required to have such a lavatory by paragraph (a)(3) of this section, shall be equipped with an operable on-board wheelchair for the use of passengers.

(ii) The carrier shall ensure that an operable on-board wheelchair is provided for a flight using an aircraft with more than 60 passenger seats on the request (with advance notice as provided in § 382.33(b)(8)) of a qualified individual with a disability who represents to the carrier that he or she is able to use an inaccessible lavatory but is unable to reach the lavatory from a seat without the use of an on-board wheelchair.

(iii) On-board wheelchairs shall include footrests, armrests which are movable or removable, adequate occupant restraint systems, a backrest height that permits assistance to passengers in transferring, structurally sound handles for maneuvering the occupied chair, and wheel locks or another adequate means to prevent chair movement during transfer or turbulence. The chair shall be designed to be compatible with the maneuvering space, aisle width, and seat height of the aircraft on which it is to be used, and to be easily pushed, pulled, and turned in the cabin environment by carrier personnel.

\*     \*     \*     \*     \*     \*

(2) Each carrier, within two years of the effective date of this part, shall comply with the provisions of paragraph (a)(4) of this section with respect to all aircraft with more than 60 passenger seats operated under 14 CFR part 121.

(c) Whenever an aircraft operated under 14 CFR part 121 which does not have the accessibility features set forth in paragraph (a) of this section undergoes replacement of cabin interior elements or lavatories, or the replacement of existing seats with newly manufactured seats, the carrier shall meet the requirements of paragraph (a) of this section with respect to the affected feature(s) of the aircraft.

(d) Aircraft operated under 14 CFR part 121 with fewer than 30 passenger seats (with respect to the requirements of paragraph (a)(1) of this section), fewer than 100 passenger seats (with respect to the requirements of paragraph (a)(2) of this section) or 60 or fewer passenger seats (with respect to the requirements of paragraph (a)(4) of this section), and aircraft operated under 14 CFR part 135, shall comply with the requirements of this section to the extent not inconsistent with structural, weight and balance, operational and interior configuration limitations.

**12.** Section 382.7(a)(2) of Title 14 of the Code of Federal Regulations provides:

(a) A carrier shall not, directly or through contractual, licensing, or other arrangements:

\*     \*     \*     \*     \*     \*

(2) Require a individual with a disability to accept special services (including, but not

Although the ACAA is otherwise silent as to what is, and what is not, discriminatory, Section 382.7 of Title 14 of the Code of Federal Regulations does provide the appropriate framework. Those regulations provide:

### § 382.7 General prohibition of discrimination.

(a) A carrier shall not, directly or through contractual, licensing, or other arrangements:

(1) Discriminate against any otherwise qualified individual with a disability, by reason of such disability, in the provision of air transportation;

(2) Require a individual with a disability to accept special services (including, but not limited to, preboarding) not requested by the passenger;

(3) Exclude a qualified individual with a disability from or deny the person the benefit of any air transportation or related services that are available to other persons, even if there are separate or different services available for individuals with a disability except when specifically permitted by another section of this part; or,

(4) Take any action adverse to an individual because of the individual's assertion, on his or her own behalf or through or behalf of others, of rights protected by this part or the Air Carrier Access Act.

(b) If an indirect air carrier provides facilities or services for passengers that are covered for other carriers by sections §§ 382.21–382.55, the indirect air carrier shall do so in a manner consistent with those sections.

(c) Carriers shall, in addition to meeting the other requirements of this part, modify policies, practices, and facilities as needed to ensure nondiscrimination, consistent with the standards of section 504 of the Rehabilitation Act, as amended. Carriers are not required to make modifications that would constitute an undue burden or would fundamentally alter their program.

In addition to these general prohibitions, there are a series of specific regulations in Title 14 of the Code of Regulations circumscribing that which is discriminatory, relating to, among other things, aircraft accessibility,[13] a prohibition against "refusal" of transportation,[14] a prohibition against requiring advance notice of travel by a handicapped person,[15] a prohibition against requiring (with certain special exceptions) a handicapped person from traveling with his or her own "attendant",[16] seating assignments,[17] seating accommodation,[18] provision of certain services and equipment (*e.g.*, wheelchairs, etc.),[19] boarding assistance on small and large aircrafts—*none* of which includes *preboarding;* [20] assistance in stowage of personal equipment,[21] treatment of mobility aids and assistive devices,[22] passenger information (*e.g.*, seating

limited to, *preboarding* ) not requested by the passenger; (Emphasis added).

This section reinforces this court's view that the ACAA was enacted to treat all passengers—handicapped and non-handicapped alike—equally (save in those special matters referred to in Section 382.21 of Title 14 of the Code of Federal Regulations as set forth in note 11, *supra.)*

13. Section 382.21.

14. Section 382.31.

15. Section 382.33.

16. Section 382.35.

17. Section 382.37.

18. Section 382.38.

19. Section 382.39.

20. Sections 382.40 and 382.40a.

21. Section 382.41.

22. Section 382.43.

locations, lavatory information, etc.),[23] accommodations for those with hearing impairments,[24] security screening,[25] prohibiting the refusal to provide transportation to those with communicable diseases (except where the health and safety of others would be endangered),[26] prohibiting the requirement that handicapped persons have medical certificates,[27] certain miscellaneous provisions, all of which relate to service and inflight accommodations; [28]. and prohibiting the charging of a fee to accommodate handicapped persons.[29]

While not suggesting that these specific regulations are exclusive to other species or manners of discrimination falling with the ambit of the ACAA, those regulations are telling in one respect. All of those regulations relate to the manner in which handicapped persons are provided services, *e.g.*, seating, access to lavatories, wheelchair assistance—by the airlines. None suggest that demeanor of airline employees standing alone, uncivil as that demeanor may be, entitles the handicapped passenger to bring suit for damages under the ACAA. This court accordingly finds and concludes that, even if the airline agents "... talk[ed] over his [plaintiff's] head"...directing their remarks to the plaintiff's brother,[30] that isolated occurrence, not relating to the actual services provided by the airline, no matter how distasteful or uncivil it may well have been, does not warrant an action for damages under the ACAA. *Cf. Fitch v. Solipsys Corporation*, 94 F.Supp.2d 670, 676–677 (D.Md.2000).[31]

Nothing in the statute or implementing regulations even remotely suggests that an isolated display of inappropriate demeanor on one single occasion, standing alone, is an act of *discrimination* within the meaning of the ACAA—much less an act of discrimination for which a complaining party may bring suit.

### 2. The "It" Reference

■ Plaintiff's second claim [32] is that he is entitled to damages under the ACAA because airline agents treated plaintiff in a humiliating and derogatory fashion by referring to him, on account of his handicap, as an "It". That claim is predicated on the colloquy occurring at the airport as reported by plaintiff's sister-in-law, to wit:

... when she [plaintiff's sister-in-law] told one of the America West agents at the gate that "He (Deterra) needs to get on so that we can get him safely into the

---

23. Section 382.45.

24. Section 382.47.

25. Section 382.49.

26. Section 382.51.

27. Section 382.53.

28. Section 382.55.

29. Section 382.57.

30. As this court must assume for purposes of defendant's motion for summary judgment..

31. There that court observed in connection with a claim brought under the Americans with Disabilities Act of 1990 (*Id.*):

As to Fitch's disability harassment claim, even if two uses of the term "cripple" indicate that Solipsys viewed Fitch as disabled, these two incidents are not sufficiently severe or pervasive to constitute discriminatory harassment.

32. This second claim appears to be an eleventh-hour claim. In his Answer to Interrogatory No. 16 (in which he purported to set forth all of the facts upon which his claims of discrimination were based—Exhibit 2 to defendant's Memorandum of Law in support of its motion for summary judgment (# 33)), nothing was said on this matter. Testimony on this matter apparently was taken during the course of a deposition, and that testimony was first transformed into a claim in plaintiff's opposition to the motion for summary judgment.

chair," the agent said "*It's* going to have to wait until last." She also recalls that when she complained that she could not believe they were not going to be able to board, the agent said "We can't handle *it* now" and "Look, *it's* going to have to wait until last."

Even assuming that one could reasonably infer from the word "it" in the context of the in the above-referenced colloquy the sinister meaning ascribed to it by plaintiff, much less a reasonable inference that the speaker or speakers intended that reasonable inference on account of the handicap of the plaintiff, that, alone, for the reasons set forth in Part IV.1 immediately above, does not warrant damage relief under the ACAA. *Cf. Fitch v. Solipsys Corporation, supra,* and note 31, *supra.*

In any event, based on the record before this court,[33] this court concludes that no reasonable trier of fact could reasonably conclude that the agents, in using the word "it" as referred to above, intended anything demeaning whatsoever on account of the fact that the plaintiff was handicapped. In context, given the full colloquy, the use of the word "it" was grammatically correct and expected. That colloquy cannot reasonably support an inference, an inference which could be drawn by a reasonable trier of fact, that the agents of the airline demeaned the plaintiff on account of his handicap.

### 3. *The Want of a Complaint Resolution Officer*

■ Plaintiff's final fallback is that he is entitled to bring suit for monetary damages on account of the fact that, at the time of the incident referred to in the complaint, the airlines did not immediately make a Complaint Resolutions Officer present.

Some four years after the enactment of the immediate predecessor to the ACAA,[34]

---

**33.** On this point, plaintiff was only able to refer to the colloquy set forth in the text, and nothing else. There was nothing which plaintiff was able to point to concerning tone of voice or inflection. The claim that the agents of the defendant used the word "it" in a demeaning manner is based solely on the use of the word "it" in the context of that colloquy, nothing more, and nothing less.

**34.** Legislation aimed to eliminate discrimination on aircrafts or by the airlines has suffered a rather bumpy travel over several paths. In or about 1982, the Civil Aeronautics Board, based on Section 504 of the Rehabilitation Act of 1973, promulgated regulations proscribing discrimination. In 1986, the Supreme Court of the United States concluded that those regulations could not be construed so as to apply to *private* air carriers—*i.e.*, air carriers not receiving federal financial assistance. *United States Department of Transportation v. Paralyzed Veterans of America,* 477 U.S. 597, 106 S.Ct. 2705, 91 L.Ed.2d 494 (1986).

In response to the *Paralyzed Veterans of America* decision, Congress, in 1986, enacted the first iteration of the ACAA. 49 U.S.C.App.

1374(c). That statute, as enacted at that time, provided as follows:

(1) No air carrier may discriminate against any otherwise qualified handicapped individual, by reason of such handicap, in the provision of air transportation.

(2) For the purpose of paragraph (1) of this subsection the term "handicapped individual" means any individual who has a physical or mental impairment that substantially limits one or more major life activities, has a record of such impairment, or is regarded as having such an impairment.

(3) Within one hundred and twenty days after the date of the enactment of this Act, the Secretary of Transportation shall promulgate regulations to ensure non-discriminatory treatment of qualified handicapped individuals consistent with safe carriage of all passengers on air carriers.

In 1994, Section 41705 of Title 49 was enacted as P.L., 103–272. That Section 41705, as enacted at that time, provided in its entirely:

§ 41705. **Discrimination against handicapped individuals**

In providing air transportation, an air carrier may not discriminate against an other-

the Department of Transportation, in 1990, promulgated a series of regulations relating to discrimination, many of which are referred to above.[35] Section 382.65 of those regulations promulgated in 1990 provides in pertinent part:

§ 382.65   Compliance procedures.

(a) Each carrier providing scheduled service shall establish and implement a complaint resolution mechanism, including designating one or more complaint resolution official(s)(CRO) to be available at each airport which the carrier serves.

(1) The carrier shall make a CRO available to any person who complains of alleged violations of this part during all times the carrier is operating at the airport.

(2) The carrier may make the CRO available via telephone, at no cost to the passenger, if the CRO is not present in person at the airport at the time of the complaint. If a telephone link to the CRO is used, TDD service shall be available so that persons with hearing impairments may readily communicate with the CRO.

Plaintiff can show (see Part I.7 above):

Plaintiff and/or his relatives disagreed with America West's response. Catherine Deterra claims that she asked to speak to a supervisor, was told by an America West agent named Robert that there was no supervisor available, and he gave her a telephone number to contact. She claims that she was told by the woman she spoke to at that number that the woman was "dismayed" at what was happening but that there was no one available to resolve the problem due to the late hour.

Based on this, plaintiff says that the defendant violated the provisions of Section 382.65 by not having a CRO available at the time of the incident,[36] and based on this shortcoming, and this shortcoming alone,[37] plaintiff says that he is entitled to money damages in an action brought under the ACAA.

In this court's view, plaintiff has not established to the satisfaction of this court that the violation of this particular regula-

---

wise qualified individual on the following grounds:
(1) the individual has a physical or mental impairment that substantially limits one or more major life activities.
(2) the individual has a record of such an impairment.
(3) the individual is regarded as having such an impairment.

Nothing in the new § 41705 directed the Secretary of the Department of Transportation to promulgate regulations—most likely for the reason that, as set forth in the text below, the rules under its predecessor (49 U.S.C.App. 1374(c)) had been promulgated in 1990.

**35.** By Public Law 106–181, effective September 1, 1999, and after the events referred to in the complaint, subsections (b) and (c) were added to the ACAA. Subsection (c)(4) concerns training and planning by the Department of Transportation.

**36.** In the record provided by the plaintiff, it appears that Catherine Deterra asked to speak to a *supervisor*, not a Complaint Resolution Officer ("CRO") within the meaning of Section 382.65. For the purposes of defendant's motion for summary judgment, however, we assume that plaintiff meant that they attempted to contact a CRO.

**37.** Plaintiff has not suggested that if a CRO was made available, he or she would have directed the airline to halt its ongoing boarding procedures so that plaintiff and those who accompanied him would have boarded then and there, and this court cannot reasonably infer that that would have been the case. At most, counsel for plaintiff suggested at oral argument that, had the CRO responded to the telephone call, the rather heated exchanges which occurred thereafter would not have occurred.

tion, standing alone, authorizes the plaintiff to repair to the federal courts to bring suit for an award of monetary damages.[38] That is to say, plaintiff has not shown that Congress, in enacting the ACAA, and directing the Secretary of Transportation to "promulgate regulations to ensure non-discriminatory treatment of qualified handicapped individuals consistent with safe carriage of all passengers on air carriers", intended to grant the Secretary of Transportation the authority, explicitly or implicitly, to create a private right of action for conduct which is not, in and of itself discriminatory.[39]

On this matter, in his memorandum in opposition to defendant's motion for summary judgment, as well as at the hearing on the motion, plaintiff asked the wrong question—begetting, of course, the wrong answer. All plaintiff says is that the Department of Transportation, in promulgating this particular regulation, created a substantive right favoring the plaintiff and those similarly situated. But that is only the first step in a two-step analysis. As

this court sees it, particularly in view of the holding in *Alexander v. Sandoval*, 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001), it is not enough to ask whether DOT, in promulgating Section 382.65, intended to confer a substantive right in favor of the plaintiff. To the contrary, the second, and far more important, question is whether Congress intended, by the language of the enabling statute, that a handicapped person such as plaintiff (and those similarly situated) could resort to the federal courts for compensatory damages for the violation of that alleged right. This second question looms, since, although Congress may grant an agency of the executive branch authority to promulgate the minutia and interstices of what may, and may not, be done under a broadly worded statute, consistent with Congressional intent, and, to that extent, "create" substantive rights, only Congress, and Congress alone, because of Article III constraints, can confer jurisdiction in the federal courts. That point is made clear in *Alexander v. Sandoval, supra*, where the ma-

38. None of the parties addressed the matter of whether a violation of the regulation, alone, warrants the exercise of jurisdiction over plaintiff's claim in this regard. It was not addressed at all in defendant's motion for summary judgment or supporting memorandum—no doubt for the reason that this theory of recovery was first suggested in plaintiff's opposition to that motion. And, notwithstanding the fact that the issue was first raised in that opposing memorandum, plaintiff was short on any law suggesting that a violation of the regulation, alone, warrants the exercise of jurisdiction over plaintiff's claim in this regard. All plaintiff said on this score is (Plaintiff's Memorandum in Support of Opposition (# 38, p. 15)) that the defendant failed to comply with the regulation, and, accordingly, "America West is not entitled to Summary Judgment on this issue in light of its clear violation of the ACAA."—without reference to any authority whatsoever.

39. Plaintiff has never suggested that the failure of a CRO to respond then and there to the

incident at hand was discriminatory in and of itself—*i.e.*, that a CRO did not appear *because* plaintiff had a physical or mental impairment that substantially limited one or more major life activities, or because plaintiff had a record of such an impairment, or because plaintiff was regarded as having such an impairment. For all the record shows, a CRO did not respond because "...there was no one available to resolve the problem *due to the late hour.*" *See* General Undisputed Facts, Part I.7, p. 5, *supra*. At most, the defendant airline was negligent in this regard, but did not act in a discriminatory manner.

Indeed, according to plaintiff's version of the statement of undisputed facts, plaintiff's sister-in-law first asked for the supervisor *after* the occurrence of the only two alleged discriminatory acts discussed above in the text. Thus, plaintiff cannot suggest that the defendant's failure to have a CRO present because of the lateness of the hour *caused* the discrimination about which plaintiff complains.

jority observed, *inter alia* (*Id.*, at 286–287, 121 S.Ct. 1511):

> Implicit in our discussion thus far has been a particular understanding of the genesis of private causes of action. Like substantive federal law itself, private rights of action to enforce federal law must be created by *Congress*. *Touche Ross & Co. v. Redington*, 442 U.S. 560, 578, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979) (remedies available are those "that Congress enacted into law"). The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right *but also* a private remedy. *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 15, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979). Statutory intent on this latter point is determinative. *See, e.g., Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1102, 111 S.Ct. 2749, 115 L.Ed.2d 929 (1991); *Merrell Dow Pharmaceuticals Inc. v. Thompson*, 478 U.S. 804, 812, n. 9, 106 S.Ct. 3229, 92 L.Ed.2d 650 (1986) (collecting cases). Without it, a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute. *See, e.g., Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 145, 148, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985); *Transamerica Mortgage Advisors, Inc. v. Lewis, supra*, at 23, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146; *Touche Ross & Co. v. Redington*, supra, at 575–576, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82. "Raising up causes of action where a statute has not created them may be a proper function for common-law courts, but not for federal tribunals." *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 365, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991) (SCALIA, J., concurring in part and concurring in judgment). (Emphasis added).[40]

In this case, the operative statute (Section 41705 of Title 49) provides only that an air carrier "...may not *discriminate* against an otherwise qualified individual...", nothing more, and nothing less. (Emphasis added). For purposes of defendant's motion for summary judgment, we assume that, notwithstanding the failure of Congress to *explicitly* provide a remedy for acts of *discrimination* under the ACAA, Congress intended that a qualified handicapped person who was subjected to discrimination could bring suit in the federal courts for some sort of relief.[41] We also assume that under Section 3 of the predecessor to the current ACAA (that

---

**40.** At first blush, this holding in *Alexander* may appear to be inextricably at odds with the hoary, and oft-cited, maxim, first enunciated in *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 162–163, 2 L.Ed. 60 (1803), that for every right there should be a remedy.

But it is not. It may well be that that maxim may be continued to be applied where *Congress* creates a right without reference to a remedy. But, given that Article III ordains that only Congress can define the jurisdiction of the inferior courts, that maxim was not, *sub silentio*, discarded by the *Alexander* Court. That Court simply held that agencies of the *Executive* branch of government do not have to authority to define the jurisdiction of the federal courts.

**41.** Defendant does not take a contrary view—at least insofar as plaintiff, under Count I,
seeks *compensatory* damages. Defendant does contend that, even if Congress intended that a qualified handicapped person could bring suit in the federal courts for *compensatory* damages, Congress did not intend that a qualified handicapped person could bring suit in the federal courts for *punitive* damages, as sought by plaintiff in Count II—and a matter not reached by this court given this court's conclusions on, with respect to Count I.

Insofar as this court is aware, all of the courts which have addressed that question have concluded that a qualified handicapped person who has been discriminated against by an air carrier is entitled to seek some sort of relief in the federal courts. Although the source of that authority and the scope of the relief available is hotly debated, *see e.g., Tallarico v. Trans World Airlines, Inc.*, 881 F.2d

is, 49 U.S.C.App. 1374(c)),[42] Congress intended to confer upon the Department of Transportation the authority to promulgate rules and regulations defining that which should, or should not, be construed as discriminatory [43] within the meaning of the intent of Congress, and that DOT complied with that mandate in a timely and appropriate fashion.[44] And we finally assume that, in terms of the first of the four part *Cort v. Ash* analysis,[45] Section 382.65 was promulgated for the "especial benefit" of a class of persons (*i.e.*, qualified handicapped persons) to which plaintiff belongs and belonged.[46]

All that having been said, however, in light of the teachings of *Cort v. Ash*, *supra*, and *Alexander v. Sandoval*, plaintiff has not established that *Congress* intended that, in a case, such as this particular case, where an air carrier fails to have a Complaint Resolution Officer present—unintentionally, that is, *not for discriminatory purposes*—*and* where that unintentional failure did *not cause* any discernible discrimination within the meaning of the language of the ACAA or the promulgated regulations scoping that which is, and that which is not, discrimination within the meaning of the ACAA, then that sort of failure, standing alone, was and is sufficient to invoke the jurisdiction of a federal court in pursuit of a remedy in the nature of compensatory (not to mention punitive) damages.[47] Nothing in the plain meaning of the statute suggests that Congress in-

566, 570 (8th Cir.1989); *Shinault v. American Airlines, Inc.*, 936 F.2d 796, 800 (5th Cir. 1991), we assume, as set forth above, that the plaintiff is entitled to bring suit for acts of discrimination by the defendant directed to him.

**42.** As indicated above, Section 3 provided:

(3) Within one hundred and twenty days after the date of the enactment of this Act, the Secretary of Transportation shall promulgate regulations to ensure non-discriminatory treatment of qualified handicapped individuals consistent with safe carriage of all passengers on air carriers.

**43.** As it did in the various sections referred to in the text. *See* the sections referred to on pages 12–13, *supra*.

**44.** We say that even though Section 3 literally directed that those regulations be promulgated within 120 days of the enactment of 49 U.S.C.App. 1374(c). That statute was enacted on October 2, 1986—meaning, given a literal interpretation to Section 3, that those regulations should have been promulgated by on or about January 30, 1987. Those were not finally promulgated, however, until after March 6, 1990. See Rules and Regulations, Department of Transportation, Docket No. 45657, 55 FR 8008–01, 1990 WL 330808 (F.R.).

**45.** *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975).

**46.** That is not to say, however, that plaintiff and his class are the only benefactors of the provisions of Section 382.65. The primary mission of air carriers is, at bottom, to move passengers from Point A to Point B safely and efficiently. It is fair to assume that major air carriers employ scores of thousands of gate agents and others who interface with the general traveling public on a day to day basis. The concept of a CRO as, for want of a better term, on-the-spot informal mediator, serves the air carriers as well, since, then, air carriers can devote their scarce financial resources to their primary mission—and not to litigation costs involved in defending actions in the federal courts, or litigation costs incurred in defending against enforcement proceedings brought by the Department of Transportation.

So, too, is the Department of Transportation (and, derivatively, the taxpayers at large) a beneficiary. Informal resolution of potentially discriminatory occurrences by CRO's would permit the Department of Transportation to devote the funds it receives from the public fisc to its primary mission—and not divert those funds to enforcement proceedings.

**47.** Indeed, there is nothing in the rule-making which suggests the Department of Transportation intended—even if it could—a remedy in federal court for failure to comply with the provisions of Section 382.65.

That section entrusts CRO's with duties in addition to on-the-spot intervention at the re-

tended a federal court remedy. That plain language simply says that an airline "...may not discriminate against an otherwise qualified individual..." on account of a handicap. And nothing in the legislative history of the ACAA suggests that Congress intended a federal court remedy in circumstances such as those presented here. Senator Dole, the sponsor of the legislation which eventually became the ACAA (then under 49 U.S.C.App. § 1374(c)) observed:

> In fashioning remedial legislation two alternative approaches have been considered. The first was to add air carriers specifically to the coverage of section 504. Although this approach was simple and direct, substantial objections were posed by representatives of air carriers as well as those concerned with Grove City legislation. Once the scope of the legislation was expanded beyond those receiving direct assistance, the list [of those regulated under § 504] could become endless. Also, the airlines strongly felt that they should continue to be regulated under the control of the Aviation Act as the legislation providing the basic regulatory authority for their industry.
>
> For awhile it seemed that it would not be possible to reconcile these differences; however, a compromise has been reached and is reflected in S. 2703. This is now incorporated into the legislation which amends the Aviation Act and incorporates compromise definitions *which rely heavily on language and precedents from the Rehabilitation Act.* The bill also adds terminology from the FAA regulations and the Aviation Act.

132 Cong. Rec. S11784–08 (daily ed. Aug. 15, 1986) (statement of Sen. Dole).

Nothing in the language of Section 504 of the Rehabilitation Act suggests that a violation of a regulation, standing alone, which is not discriminatory in and of itself, and which does not result in discrimination, authorizes a person within the protected class to bring suit for a violation of that regulation in the federal courts. And insofar as this court has determined,[48] no precedent interpreting Section 504 of the Rehabilitation Act has ever held or suggested that a violation of a regulation, standing alone, which is not discriminatory in and of itself, and which does not result in discrimination, authorizes a person within the protected class to bring suit for a violation of that regulation in the federal courts.

■ For these reasons, in the circumstances presented here, even though a Complaint Resolution Officer was not available at the time of the incident, contrary to the provisions of Section 382.65 of the applicable regulations, that, standing alone, is insufficient to state a claim upon which relief may be granted in the federal courts under the ACAA.[49]

---

quest of a traveler. The CRO's are also required to file reports which may be used in enforcement proceedings brought by the Department of Transportation to impose civil penalties on airlines which discriminate within the meaning of the ACAA. The rules and regulations promulgated by the ACAA are conspicuously silent on the matter of creating new federal court remedies. The only remedy referred to in that section is in the nature of a fine if the Department of Transportation sought, and was successful in bringing, an enforcement action against the air carrier.

**48.** As previously mentioned, note 38, *supra,* none of parties in their respective memoranda even addressed this issue.

**49.** Inasmuch as none of the parties addressed this threshold question, none of the parties referred this court to *Love v. Delta Air Lines,* 179 F.Supp.2d 1313 (M.D.Ala.2001), for authority on this aspect of the case.

*Love* may be read as suggesting a contrary view. There the district court apparently concluded (in the context of cross motions for summary judgment) that a qualified handicapped passenger may bring suit in the feder-

## V. *Conclusion*

For the reasons set forth herein, and for the reasons set forth in the Memorandum and Order and Procedural Order (# 41) of this court dated March 28, 2002, defendant's motion for summary judgment is allowed, and judgment shall enter against plaintiff for all claims set forth in the complaint, and in favor of defendant.

al courts for a failure of an air carrier to properly train its personnel *vis a vis* the requirements of the ACAA in violation of another regulation, that is, Section 382.61 of the Code of Federal Regulations.

In this court's view, to the extent that the *Love* court meant to suggest, explicitly or implicitly, that a violation of any regulation set forth in the regulations promulgated by the Department of Transportation under Section 3 of the predecessor to the current ACAA (49 U.S.C. 1374(c)), that court was in error.

Earlier in its opinion, that court concluded that the ACAA did create an implied cause of action. *Id.* at 1321. This court does not gainsay that conclusion insofar as the *Love* court concluded that a qualified handicapped person discriminated against by an air carrier may bring suit in federal court for that act of discrimination. But, later in its opinion, that court, in addressing the DOT regulations, did not address the precise issue presented here—perhaps because, from all that appears in that opinion, none of the parties addressed that precise issue. That is to say, other than simply opining that (*Id.* at 1326):

"An agency regulation has the force and effect of law ... if it is authorized by congressional grant of authority ...." *Nieman v. Dryclean U.S.A. Franchise Co., Inc.,* 178 F.3d 1126, 1129 (11th Cir.1999) (citing *Chrysler Corp. v. Brown,* 441 U.S. 281, 302, 99 S.Ct. 1705, 60 L.Ed.2d 208, (1979)),

that court did not address the more specific question as to whether a violation of regulation in a non-discriminatory manner which did not *cause* discrimination warrants resort to a federal court for a remedy.

It is one thing to say that an agency regulation has "the force and effect" of law. It is quite another to say that an agency regulation alone can confer jurisdiction in the federal courts, since, as previously observed, only Congress can define the jurisdiction of the inferior courts. *Alexander v. Sandoval, supra,* at 286–287, 121 S.Ct. 1511. As the *Alexander* Court observed (*Id.* at 291, 121 S.Ct. 1511);

Language in a regulation may invoke a private right of action that Congress through statutory text created, but it may not create a right that Congress has not. *Touche Ross & Co. v. Redington,* 442 U.S. at 577 n. 18, 99 S.Ct. 2479, 61 L.Ed.2d 82 ("[T]he language of the statute and not the rules must control"). Thus, when a statute has provided a general authorization for private enforcement of regulations, it may perhaps be correct that the intent displayed in each regulation can determine whether or not it is privately enforceable. *But it is most certainly incorrect to say that language in a regulation can conjure up a private cause of action that has not been authorized by Congress.* Agencies may play the sorcerer's apprentice but not the sorcerer himself. (Emphasis added).

In this case, nothing in the *statute* even remotely suggests that Congress had provided a "general authorization for private enforcement of regulations" promulgated consistent with the ACAA. To the extent that the *Love* court may have concluded to the contrary, this court departs from that conclusion for the reasons set forth in the text.

In any event, *Love* is distinguishable. In that case, it could be said that the violation of the regulation there involved—the regulation requiring training—*caused* a distinct act of discrimination covered by the ACAA. That is to say, in that case, the plaintiff alleged that the failure to train *caused* a discriminatory act, that is, she was deprived of the means to use the lavatory in the aircraft solely on account of her handicap. That is clearly not this case, since, in this case, plaintiff does not even allege, much less says that he will show, that the failure of a CRO to be present at the time of the incident was on account of the fact that the plaintiff was handicapped, and plaintiff cannot realistically show that that failure *caused* in any manner the acts of discrimination set forth in Parts IV.1 and IV.2 above.