Keith W. FITCH, Plaintiff,

v.

SOLIPSYS CORPORATION, Defendant.

Civil No. AMD 99–1507.

United States District Court, D. Maryland.

April 6, 2000.

Stephanie Gordon Posner, Scott A. Thomas, Lawrence J. Quinn, Tydings & Rosenberg, LLP, Baltimore, MD, for Plaintiff.

Timothy F. McCormack, Hoffberger & Hollander, LLC, Baltimore, MD, for Defendant.

## MEMORANDUM

DAVIS, District Judge.

The plaintiff, Keith W. Fitch, has brought suit against his former employer, defendant Solipsys Corporation ("Solipsys"), alleging disability discrimination under the Rehabilitation Act of 1973, 29 U.S.C. § 793, and the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* In addition, Fitch claims that while he worked at Solipsys, he opposed discrimination at the company on the basis of race and gender and was terminated in retaliation for this opposition in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Fitch has also brought several state law claims based on supplemental jurisdiction. *See* 28 U.S.C. § 1367.

Specifically, Fitch contends that although the three principals of Solipsys, Warren Citrin, David Buscher and Robert Thurber, knew that he had a heart condition and a lifting restriction when they hired him, they refused to accommodate his disability when he began to request that they do so some ten months after commencing work at Solipsys. Instead, he alleges, they launched a campaign of disability harassment, they demoted him, they sought to build a record upon which to terminate his employment, and they did terminate him, in part because of his disability, and, in part, because he protested when Citrin made sexist or racist remarks. Fitch seeks injunctive relief, back pay, compensatory and punitive damages and attorney's fees.

Pending before the court is Solipsys' motion for summary judgment.[1] I have

---

1. Fitch has filed a motion to file a surreply, which I shall grant.

carefully considered the parties' memoranda and exhibits; no hearing is necessary. For the reasons stated below, I shall grant summary judgment to Solipsys on all federal claims. I shall decline to exercise supplemental jurisdiction over the state law claims and I shall dismiss those claims without prejudice.

(i)

Pursuant to Fed.R.Civ.P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material for purposes of summary judgment, if when applied to the substantive law, it affects the outcome of the litigation. *Id.* at 248, 106 S.Ct. 2505. Summary judgment is also appropriate when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

A party opposing a properly supported motion for summary judgment bears the burden of establishing the existence of a genuine issue of material fact. *Anderson*, 477 U.S. at 248–49, 106 S.Ct. 2505. "When a motion for summary judgment is made and supported as provided in [Rule 56], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavit or as otherwise provided in [Rule 56] must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). *See Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505; *Shealy v. Winston*, 929 F.2d 1009, 1012 (4th Cir.1991). Of course, the facts, as well as the justifiable inferences to be drawn therefrom, must be viewed in the light most favorable to the nonmoving party. *See Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court, however, has an affirmative obligation to prevent factually unsupported claims and defenses from proceeding to trial. *See Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir.1987).

(ii)

Drawing all reasonable inferences in favor of Fitch, the following constitutes a summary of the facts of the case.

Fitch is a 37 year-old Caucasian who, at the age of 15, underwent a surgical procedure for the correction of a coarctation of the aorta. He also has a deteriorating bicuspid heart valve. Fitch's surgery was successful and has allowed him to enjoy an active lifestyle, however, his doctor has restricted him from lifting more than forty pounds or from engaging in any other isometric exercise. Fitch is an engineer who, from June 1996 until February 13, 1998, when his employment was terminated, worked as Director of Computer Systems at Solipsys.

Fitch worked with the principals of Solipsys at the Johns Hopkins Applied Physics Laboratory before they formed Solipsys in early 1996. The principals, Citrin, Buscher and Thurber, all knew of his heart condition, but recruited him to be the Director of Computer Systems at Solipsys soon after it was formed. Upon his hiring in June 1996, Fitch provided Solipsys a letter from his doctor memorializing his 40 pound lifting and isometric exercise restrictions.

While Fitch's papers are somewhat unclear about where and when the following incident took place, drawing all inferences favorably to Fitch, I assume that this incident happened, and it does not matter where or when. Sometime in Spring or Summer 1997, Fitch worked on a Marine Corps project during which he installed and deinstalled computer equipment. He was usually the only Solipsys employee at

the site and the job required lifting 100 pounds and over. He asked Buscher for an accommodation in the form· of assistance for moving the heavy equipment. Buscher flew in his 18 year-old son and another teenager, Brad Wolters, to help. However, the teenagers showed up late to help because they spent the previous night drinking. Buscher's son arrived that day saying his father told him that Fitch was a "cripple" and "not to take any shit from him." Consequently, Fitch had to move most of the equipment himself, and he later complained to Citrin and Buscher about the lack of accommodation.

On another occasion, in September 1997, Fitch had to move heavy equipment from Gulfport, Mississippi, to Fort Walton Beach, Florida, with no assistance, and he later deinstalled all of this equipment. On this occasion, Citrin saw him and remarked, "I guess you should not be doing this type of work."

Sometime in October 1997, Fitch objected to Solipsys employees' use of "Government Furnished Equipment" for non-government projects, and Citrin said he would "kick his ass" if he interfered.

On October 14, 1997, Citrin told Fitch that certain Solipsys employees were having trouble working with him and that the principals of the firm were dissatisfied with aspects of his work. Later that day, Fitch e-mailed Citrin, saying he would no longer do the job of computer procurement unless 11 conditions were met.

On November 12, 1997, Fitch had an argument with Christopher Smith, a recent college graduate who was in charge of employee reimbursements at the firm. Smith was inexperienced and overwhelmed by his job and made frequent mistakes. Fitch asked him where his most current reimbursement was and Smith told him, mistakenly, that he owed Fitch nothing.

Fitch yelled at Smith and called him a liar.[2] Fitch stormed out of Smith's office and departed the workplace.

In November 1997, during a meeting at Solipsys, Buscher made a statement to the group, which I assume for the purposes of this motion was directed at Fitch, that he would not follow the ADA regarding an alcoholic employee, because the ADA was for a bunch of "cripples."

In December 1997, Fitch objected to a comment Citrin made about an employee named Jan Blacka, outside of her presence, that she had looked "exceptionally sexy" that morning with her hair wet when she bent over to check some computer plugs. Fitch told Citrin remarks like that could get the company in trouble. At some point during Fitch's employment, Citrin made a remark to him and Eric Conn while they were traveling on a business trip. On this occasion, Citrin stated that he wanted to replace the general administrative staff with big breasted women. Again, Fitch objected to the sexist remark. On two occasions, once in November 1997 and once in December 1997, Citrin made a remark that too many black people are having children and not enough white people.

In September or October of 1997, and again in January 1998, Fitch requested Solipsys to remove him from the Marine Corps project as an accommodation for his health limitations. On January 13, 1998, Fitch e-mailed Citrin complaining that his "work is not appreciated," he is underpaid, and citing "hundreds of reasons" why he is dissatisfied and wants off the Marine Corps project. Citrin met with Fitch that same day and asked him to reconsider his request to be removed from Marine Corps project, and told him that he should look for another job if he was unwilling to

---

**2.** Fitch later asserted to his employer that Smith had called him a liar, however, his deposition testimony is clear that Fitch was the one that used this term. Fitch felt that Smith was questioning his honesty by the mere fact of saying he did not owe him any reimbursements when Fitch claimed he did. For him, that was tantamount to being called a liar; even at his deposition, in September 1999, he insisted that his reaction was appropriate under the circumstances.

comply. He offered Fitch a generous severance package. Citrin e-mailed the other principals, explaining that Fitch's situation was not improving and that Fitch was increasingly frustrated with incorrect invoices and other business management problems. Citrin speculated, "[m]y guess is that Keith is basically depressed and can't be satisfied regardless of anything we do. He will probably leave in the near future. I would hesitate to include him in anything important." Citrin removed Fitch from his Marine Corps project later that day.

On January 15, 1998, Fitch e-mailed Citrin saying he was confused and offended by the severance offer. In this e-mail, he acknowledged that he had been in "a lousy mood for the past several months," but he blamed this on others. He also requested a pay raise, he reiterated his complaint that the Marine Corps project was hard on his health, and he complained that Citrin and others were making sexually degrading comments about female employees. Citrin responded three days later, withdrawing the severance offer, and warning Fitch he would be fired for cause if he failed to change his attitude. Citrin explained:

> We have tried over the past several months to respond to your concerns [however] your recent mails have convinced me that we are unable to address your issues any further.... We are not inclined to respond to hundreds of unspecified (or specified) issues. The two recurring themes—needed confirmation of Dave's desire to have you in the company and Chris Smith's ostensible attacks on your honesty—are moot....
>
> The "lousy mood" that you indicate you have been in for the past several months ... has created an atmosphere in which many of us have avoided professional contact with you whenever possible. Your attitude is not conducive to maintaining a friendly and productive

work environment and greatly diminishes your value to the company as a technical resource. If your grievances are such that this counter-productive conduct is going to persist, you will be asked to resign or you will be terminated for cause.

On Saturday, February 7, 1998, just prior to leaving for a skiing vacation, Fitch e-mailed Citrin an update on five projects Citrin wanted him to complete before leaving. He reported that two of the deliverables were complete but that the additional three could not be completed because he had not been given access to the passwords or equipment that he needed. Citrin examined Fitch's computer while he was on vacation and mistakenly concluded he had removed the hard drive. Assuming Fitch's facts to be true, Citrin also misinterpreted an e-mail Fitch had sent to another Solipsys employee, and concluded that Fitch was urging her to leave the company. On Monday, February 13, 1998, Citrin fired Fitch while Fitch was still on vacation.

### (iii)

Fitch claims that he is disabled because he has an artificial aorta to correct a coarctation of the aorta and he has a deteriorating bicuspid valve which restricts him from lifting more than 40 pounds and from isometric exercise. He alleges that Solipsys terminated him because of his disability in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, and the Rehabilitation Act of 1973, 29 U.S.C. § 793, applicable here by virtue of Solipsys' government contract work.[3]

■ The *McDonnell Douglas* burden-shifting scheme generally applies in analyzing wrongful termination claims under the ADA in cases like Fitch's "where the defendant disavows any reliance on discriminatory reasons for its adverse employment action." *Runnebaum v. NationsBank of Maryland, N.A.*, 123 F.3d 156,

---

**3.** Because the ADA and the Rehabilitation Act are governed by the same legal standards and precedent for purposes of employment discrimination, *see* 29 U.S.C. § 794(d), these

claims are duplicative. For simplicity, I shall refer to Fitch's disability discrimination claims collectively as "the ADA claim."

164 (4th Cir.1997)(*citing McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). The *McDonnell Douglas* proof scheme involves a three-step process. First, the plaintiff must project evidence sufficient to establish a prima facie case of discrimination. By so establishing a prima facie case, the plaintiff creates a rebuttable "presumption that the employer unlawfully discriminated against" him, and the burden of producing evidence on the issue shifts to the employer. *Runnebaum,* 123 F.3d at 164 (*citing Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). The employer then must "rebut the presumption of discrimination by producing evidence that the plaintiff was [terminated] ... for a legitimate, nondiscriminatory reason." *Id.* The employer "must clearly set forth ... reasons for its action which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *Id.* (*quoting St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). Finally, if the employer meets its burden of production, the presumption raised by the prima facie case is rebutted and "drops from the case," and the plaintiff must project sufficient evidence to sustain his ultimate burden of proving that he has been the victim of intentional discrimination. *Id.*

■ The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual...." 42 U.S.C. § 12112(a). To establish a violation of the ADA, Fitch must show (1) that he had a disability; (2) that he is qualified for the job; and (3) that Solipsys' termination of Fitch was unlawful discrimination based on his disability. *Tyndall v. National Educ. Centers, Inc.,* 31 F.3d 209 (4th Cir.1994). The ADA defines "disability" as a "physical or mental impairment that substantially limits one

or more of the major life activities of such individual; a record of such an impairment; or being regarded as having such an impairment." 42 U.S.C. § 12102(2). The ADA and the EEOC interpretive guidelines define "major life activities" to include "working" and "lifting." *Williams v. Channel Master Satellite Systems, Inc.,* 101 F.3d 346, 349 (4th Cir.1996), *cert. denied sub nom Williams v. Avnet, Inc.,* 520 U.S. 1240, 117 S.Ct. 1844, 137 L.Ed.2d 1048 (1997).

To establish that one is disabled, one must show that one is "significantly restricted" in performing a major life activity "as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1)(ii). Moreover, when the major life activity at issue is working, the "inability to perform a single, particular job does not constitute a substantial limitation;" in this circumstance "substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs of various classes...." 29 C.F.R. § 1630.2(j)(3). As the Fourth Circuit declared in *Williams,* "like the Eighth Circuit, we hold, as a matter of law, that a twenty-five pound lifting limitation—particularly when compared to an average person's abilities—does not constitute a significant restriction on one's ability to lift, work, or perform any other major life activity." 101 F.3d at 349 (*citing Aucutt v. Six Flags Over Mid-America,* 85 F.3d 1311, 1319 (8th Cir. 1996)).

■ *Williams* is controlling here. Accordingly, because Fitch has not established that he is "disabled" under the ADA, he has failed to present a prima facie case of disability discrimination. Fitch proffered his doctor's letter advising that his medical condition restricts him from "heavy lifting (weights lifted not to exceed forty pounds) or other isometric exercise." [4] However, such a weight re-

---

4. The addition, "or other isometric exercise," does not take Fitch outside of the Fourth

Circuit case law that mere lifting restrictions are not per se disabling for purposes of the

striction is not a disability under the ADA. *Id; Halperin v. Abacus Technology Corp.*, 128 F.3d 191 (4th Cir.1997). Whereas an employee engaged in manual labor who regularly and routinely engages in heavy and medium labor [5] might qualify as "disabled" by a permanent medical restriction against bending over or lifting more than 25 pounds, *Frix v. Florida Tile Indus., Inc.*, 970 F.Supp. 1027 (N.D.Ga.1997); *see Reidy v. Runyon*, 971 F.Supp. 760, 768–69 (E.D.N.Y.1997), a white collar worker who relies upon highly specialized computer skills simply is not "disabled" by such a restriction, despite the fact that if he could lift, he might occasionally do some lifting on some computer installation jobs. *Halperin*, 128 F.3d at 200.

Indeed, it is clear that Fitch's lifting restriction does not "significantly limit his ability to perform a wide range of jobs" because two months after his termination at Solipsys, he found comparable work with a different employer. *See id.* Based on this record, no reasonable jury could conclude that Fitch's lifting restriction *significantly* limited his ability to work.

■ Similarly, no reasonable jury could conclude that Fitch was terminated because Solipsys *perceived* him to be disabled. The ADA definition of "disability" includes not only employees with a physical or mental impairment that substantially limits one or more of the major life activities, but also employees who are "regarded as having such an impairment." 42 U.S.C. § 12102(2). Fitch has proffered evidence, which I presume for the purposes of this motion to be true, that Citrin and Buscher's son each referred to him once as a "cripple." However, in the context of a work environment like that at Solipsys,

where by Fitch's own admission, employees regularly used derogatory nicknames for each other,[6] this name-calling, by itself, does not establish that Fitch was "regarded as" disabled. *Cf. Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 512(4th), *cert. denied*, 513 U.S. 1058, 115 S.Ct. 666, 130 L.Ed.2d 600 (1994)(noting in age discrimination case that evidence of "stray remarks" having a patina of discriminatory animus lacks probative value).

Fitch was never on limited duty of any kind. *See Reidy v. Runyon*, 971 F.Supp. 760 (fact that employer placed plaintiff on limited duty and refused to assign him overtime "because it was outside his limitations" indicated that employer regarded him as disabled). He never suffered an injury or accident at work and was never absent due to his medical condition for any extended period of time. Indeed, Fitch's principal complaint as to his disability claim is that Solipsys failed to take seriously his requests for "accommodation," i.e., help in moving computer equipment, and that he was routinely expected to complete his increasing responsibilities without assistance. In other words, Fitch's real complaint is that his employer treated him as if he were *not* disabled and needed no accommodation. In any event, as explained below, Fitch has not brought forward evidence upon which a reasonable jury could conclude that he was terminated, in whole or in part, because of any "perceived" disability. Accordingly, Fitch's disparate treatment disability claims fail as a matter of law.

■ As to Fitch's disability harassment claim, even if two uses of the term "cripple" indicate that Solipsys viewed Fitch as

---

ADA. Lifting a weight is one type of isometric exercise, pushing against a weight would be another. Certainly, if a restriction against lifting 25 pounds is not a disability under the statute, then a restriction against lifting or pushing 40 pounds is not, as well.

**5.** 20 C.F.R. § 404.1567(1997)(heavy labor jobs require lifting objects weighing up to 100 pounds with frequent lifting of objects weigh-

ing up to 50 pounds, and medium labor jobs require lifting objects weighing up to 50 pounds with frequent lifting of objects weighing up to 25 pounds).

**6.** Fitch admitted his own use of the offensive nickname "Chim Chim" for a fellow employee, and the fact that another employee called someone else "Thumper."

disabled, these two incidents are not sufficiently severe or pervasive to constitute discriminatory harassment. *See Wallin v. Minnesota Dept. of Corrections,* 153 F.3d 681 (8th Cir.1998), *cert. denied,* 526 U.S. 1004, 119 S.Ct. 1141, 143 L.Ed.2d 209 (1999). Fitch alleges that some fellow employees refused to cooperate with him, to give passwords, information and equipment, but he nowhere alleges that this lack of cooperation was motivated by discrimination based on any actual or perceived disability. Fitch's e-mails accuse Citrin of making his relationships with co-employees difficult by referring to Fitch as a "madman," but he does not otherwise oppose Solipsys' explanation that co-employees' cooperation with Fitch was hindered by his pugnacious attitude toward them. Fitch also alleges that he was "demoted" after requesting accommodation for his lifting restriction. However, what he claims was a demotion, removal from the Marine Corps project, was actually one of the accommodations that he had requested. He cannot request removal from a project as an accommodation of his disability, and then sue for disability discrimination when that request is granted.

### (iv)

Fitch alleges that throughout the course of his employment with Solipsys, he complained on numerous occasions, including in January 1998, when Solipsys' principals made derogatory comments about women and African–Americans. He contends that his complaints were protected opposition to discrimination under Title VII and that when he was fired in February 1998, in part because of these complaints, Solipsys unlawfully retaliated against him. for his protected activity.

■ Title VII makes it an "unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e–3(a). The *McDonnell Douglas* burden-shifting scheme applies in analyzing retaliation claims under Title VII. *Smith v. First*

*Union Nat'l Bank,* 202 F.3d 234, 248 (4th Cir.2000)(*citing McDonnell Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. 1817). First, the plaintiff must establish a prima facie case of retaliation. *Id.* (*citing Beall v. Abbott Labs.,* 130 F.3d 614, 619 (4th Cir.1997)). The burden then shifts to the employer to produce a legitimate nondiscriminatory reason for the adverse action. *Id.* The plaintiff must then demonstrate that the employer's reason was mere pretext for retaliation by showing "both that the reason was false and that discrimination was the real reason for the challenged conduct." *Jiminez v. Mary Washington College,* 57 F.3d 369, 377–78 (4th Cir.1995)(*quoting Hicks,* 509 U.S. at 515, 113 S.Ct. 2742).

■ Fitch has failed to project evidence sufficient to establish a prima facie case of retaliation because he has not brought forward evidence upon which a reasonable juror could conclude that he engaged in protected activity. Fitch proffered evidence that he complained that Citrin made derogatory remarks about women and African–Americans, however, occasional and sporadic derogatory remarks about women and African–Americans are not prohibited by Title VII. Disparate treatment on account of race and sex is prohibited, and a violation might arise through the use of derogatory speech so as to create a hostile environment because of race or gender. However, in the case at bar, Fitch nowhere alleges that a discriminatory hostile environment existed at Solipsys. Indeed, there were no identified "victims" of these offensive remarks within the targeted protected group. Fitch alleges only incidents wherein offensive remarks were made outside the presence of women and African–Americans. Moreover, while Fitch asserts that he heard the principals make such remarks throughout his 20 month employment at Solipsys, he supplies evidence of only four instances that such remarks were voiced in his presence, two regarding women and two regarding African–Americans.

There is record evidence that Citrin told "off-color" jokes and spoke about hiring big-breasted women during a business trip in the presence of Fitch and another employee. In addition, there is evidence that Citrin remarked that a female employee he had seen earlier that day "looked sexy" with wet hair when she bent over to check computer plugs. As a matter of law, such relatively mild and isolated mutterings do not rise to the level of sufficiently pervasive or severe hostility necessary to constitute a violation of Title VII.

Had the alleged remarks been made directly to women or within their hearing, and had they been made within a context of severe or pervasive sexualization of or hostility toward women, they could be viewed as hostile environment harassment. Under such circumstances, Fitch's protests to management could be protected activity under Title VII. But the remarks which are at issue here fall far short of hostile environment harassment. Fitch was protesting and seeking to rectify offensive utterances, but his decision to do so is not embraced by the protective shield of Title VII.

■ Moreover, it was not reasonable for Fitch to believe that these isolated remarks, uttered outside the presence of members of the specific protected classes, would constitute violations of Title VII. To be sure, for an employee to be protected from retaliation, it is not necessary that he oppose behavior that *actually* constitutes a Title VII violation. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 357 n. 1 (4th Cir.1985). One purpose of the prohibitions on retaliation set forth in Title VII is to encourage employees to oppose unlawful discrimination. This purpose would be undermined by a requirement that an employee must conduct a legal analysis of the viability of a Title VII claim prior to voicing opposition to discriminatory behavior. *Id.*

Efforts to achieve this purpose must be balanced, however, against an employer's interest in maintaining a harmonious, productive and loyal workforce. *Laughlin v.* *Metropolitan Washington Airports Authority*, 149 F.3d 253, 260 (4th Cir.1998); *Douglas v. DynMcDermott Petroleum Operations Co.*, 144 F.3d 364, 370 n. 7, 373–74 (5th Cir.1998), *cert. denied*, 525 U.S. 1068, 119 S.Ct. 798, 142 L.Ed.2d 660 (1999). Consequently, the Fourth Circuit has formulated a balancing test to distinguish between protected opposition and unprotected obstreperousness. *Glover v. South Carolina Law Enforcement Div.*, 170 F.3d 411, 415 (4th Cir.1999), *cert. dismissed*, —— U.S. ——, 120 S.Ct. 1005, 145 L.Ed.2d 1065 (2000); *Armstrong v. Index Journal Co.*, 647 F.2d 441, 448 (4th Cir.1981); *see Hochstadt v. Worcester Found. for Experimental Biology*, 545 F.2d 222, 230–31(1st Cir.1976). Under this test, the employee's belief that he is opposing behavior that violates Title VII must be a reasonable belief. *E.g., Glover*, 170 F.3d at 413; *Montandon v. Farmland*, 116 F.3d 355 (8th Cir.1997). Because the factual context which Fitch presents falls so far short of discriminatory harassment, it was not reasonable for him to believe that his complaints would be protected from retaliation under Title VII.

Moreover, Solipsys has presented overwhelming evidence, which Fitch does not and cannot effectively rebut, that Fitch was an obstreperous employee. For example, on October 14, 1997, Citrin told Fitch that certain Solipsys employees were having trouble working with him and that the principals were dissatisfied with some aspects of his work. The next day, Fitch e-mailed two of the firm's principals, stating that he had unilaterally decided it "would be better for the company" if he were to refuse to perform a significant aspect of his job duties—computer procurement. When Citrin responded that while some frustration at problems in the company was understandable, "confrontational responses" like "throw[ing] our hands up and quit[ting] everytime things go sour" was not constructive, and he asked Fitch to reconsider. Fitch replied that he would not resume his procurement duties unless 11 conditions were met, in-

cluding formally advising a fellow employee that he was paranoid.[7]

Similarly, on November 12, 1997, Fitch had a disagreement with the young employee in charge of reimbursing expenses, Christopher Smith. Smith was a recent college graduate who, as all parties acknowledged, was overwhelmed by his job, and who made many mistakes. According to this unrebutted evidence, Fitch became immediately and furiously angry when Smith mistakenly claimed that he did not have any outstanding reimbursements for Fitch. Fitch yelled loudly at Smith that he was a "liar," threatened to cut him off the network, stormed out of Smith's office, and then out of the workplace altogether. Fitch's immediate escalation of this dispute with a significantly younger, less-skilled employee was not reasonable and lends ample credence to Solipsys' argument that Fitch intimidated fellow employees and contributed to a disharmonious work environment.

A November 1997 e-mail from Buscher also bolsters this showing by Solipsys. Buscher explained the steps he had taken to facilitate Fitch's work and to address Fitch's legitimate complaints about disorganization within the company. He concluded by stating, "I am available any time to talk and straighten things out. If you don't want to talk that is okay also, but I would expect that you act as a professional and do your job without any rancor towards me. Shrugging your shoulder when I ask about a network problem or telling me or Erin that so-and-so is my problem is not acceptable." Thus, while Fitch may have been sincerely concerned about the treatment of women employees he had helped to recruit to Solipsys, his overall obstreperous behavior and his evident overreactions to his colleagues' misdeeds cannot be sheltered as opposition to unlawful discrimination.

\*    \*    \*    \*    \*    \*

■ Finally, the overwhelming evidence of Fitch's belligerence at work fatally undermines any disparate treatment claim or retaliation claim asserted under the ADA, as well as any retaliation claim asserted under Title VII, because it shows that Solipsys has articulated a legitimate non-discriminatory, non-retaliatory reason for Fitch's termination, which Fitch's evidence is insufficient to overcome. Thus, even if Fitch's contention that Solipsys perceived him to be disabled were supported by substantial admissible evidence, which it is not, and even if there were evidence that Solipsys was motivated to retaliate because Fitch insisted on an accommodation, which there is not, the disability discrimination and any disability retaliation claim fail as a matter of law. Fitch has not brought forward evidence to create a genuine factual dispute as to pretext. Indeed, Fitch's own evidence, his e-mails to the principals described above, are compelling proof of his unmanageable and counterproductive attitude.

Fitch argues that Solipsys' reliance upon belligerence as the cause of his termination is a pretext and that Citrin, the president of the company, was the belligerent one, not Fitch. To be sure, Citrin had not wanted to hire Fitch in the first place, but had allowed his co-principal, Buscher, to persuade him to hire Fitch. One can infer that Citrin was therefore not terribly well-disposed toward Fitch. However, it is the nature of employment hierarchies that an employee can be fired for engaging in exactly the behaviors that the owner or boss engages in. Thus, even if it is true that Citrin was belligerent, that would not prohibit Citrin or the other principals from firing Fitch for a ill-advised mimicry.

Fitch also argues that Solipsys' other stated reasons for firing him, that he stole his computer hard drive, that he did not complete critical projects before leaving on vacation, and that he was encouraging another Solipsys employee to leave, are untrue, and therefore pretextual. Solipsys acknowledges that Citrin was mistaken in

---

7. The sixth condition reads: "Tell Kirsch he's paranoid [If I wanted to get him or his analysts I would have made their lives miserable a long time ago]" (brackets in original).

his initial belief that Fitch had removed his hard drive when he went on vacation in February 1998. And, giving Fitch the benefit of the doubt, one could say that he has raised a factual issue about whether he needed the root passwords which he was denied, and that this may explain why he did not complete the projects he left undone before vacation. Moreover, there is a factual dispute about whether his e-mail to another Solipsys employee encouraged her to leave.

However, these disputes are immaterial, because even if they were resolved in Fitch's favor at trial, no reasonable jury could find that Solipsys did not have legitimate, nondiscriminatory reasons for terminating his employment and that the actual motivation was a perception that he was disabled. *See Vaughan v. The Metrahealth Companies*, 145 F.3d 197, 202 (4th Cir.1998). No employer is required to continue the employment of an uncooperative, intimidating and belligerent employee, as shown on the undisputed evidence contained in this record, as accurately characterizing Fitch. *Cf. Kubicko v. Ogden Logistics Serv.*, 181 F.3d 544 (4th Cir. 1999) (reversing a grant of summary judgment for employer in retaliation case under Title VII because the record contained evidence of a "mixed motive").

#### (v)

For the reasons stated above, I shall grant summary judgment to Solipsys as to all the federal claims. Having thus disposed of all of the federal claims in this case, I shall exercise my discretion under 28 U.S.C. § 1367(c)(3) to dismiss, without prejudice, Fitch's state claims. *See Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir.1995). A separate order follows.

#### ORDER

In accordance with the foregoing Memorandum, it is this 6th day of April, 2000, by the United States District Court for the District of Maryland,

(1) ORDERED that the plaintiff's motion to file a surreply is GRANTED; and it is further

(2) ORDERED that the motion for summary judgment is GRANTED IN PART AND DENIED IN PART AND JUDGMENT IS ENTERED IN FAVOR OF DEFENDANT AS TO ALL FEDERAL CLAIMS; and it is further

(3) ORDERED that all state law claims are DISMISSED WITHOUT PREJUDICE FOR LACK OF JURISDICTION; and it is further

(4) ORDERED that the Clerk shall CLOSE THIS CASE and TRANSMIT copies of this Order and the foregoing Memorandum to all counsel.