PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

LINDA FREILICH, M.D., P.A.; LINDA
FREILICH, M.D.,
            *Plaintiffs-Appellants,*

v.

UPPER CHESAPEAKE HEALTH,
INCORPORATED, formerly know as
Harford Memorial Hospital;
BOARD OF DIRECTORS OF UPPER
CHESAPEAKE HEALTH, INCORPORATED,
formerly known as Harford
Memorial Hospital; CECILIO T.
CAMACHO, M.D., as a Director and
individually; JOAN P. EDWARDS,
M.D., as a Director and
individually; SCOTT S. HASWELL,
M.D., as a Director and
individually; SHIRLEY S. KLEIN, as a
Director and individually; JAMES
LAMBDIN, as a Director and
individually; ANTHONY J. MEOLI, as
a Director and individually; LYLE E.
SHELDON, as a Director and
individually; DAVID F. GONANO, as a
Director and individually; SHERIF H.
OSMAN, M.D., as a Director and
individually; ROGER E. SCHNEIDER,
M.D., as a Director and
individually; DIANE K. FORD, as a
Director and individually;

No. 01-1890

H. WILLIAM ACKER, as a Director
and individually; RANDALL
WORTHINGTON, SR., as a Director
and individually; UNITED STATES OF
AMERICA; STATE OF MARYLAND,
            *Defendants-Appellees.*

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Frederic N. Smalkin, Chief District Judge.
(CA-00-3605-S)

Argued: October 29, 2002

Decided: December 13, 2002

Before WILKINSON, Chief Judge, and WIDENER and
KING, Circuit Judges.

Affirmed by published opinion. Chief Judge Wilkinson wrote the
opinion, in which Judge Widener and Judge King joined.

## COUNSEL

**ARGUED:** Paul Steven Blumenthal, LAW OFFICE OF PAUL S.
BLUMENTHAL, P.A., Annapolis, Maryland, for Appellants. Jona-
than Barkasy Sprague, POST & SCHELL, P.C., Philadelphia, Penn-
sylvania, for Appellees Upper Chesapeake Health, et al.; Wendy Ann
Kronmiller, Assistant Attorney General, Baltimore, Maryland, for
Appellee State of Maryland; Katherine Sutherland Dawson, Appellate
Staff, Civil Division, UNITED STATES DEPARTMENT OF JUS-
TICE, Washington, D.C., for Appellee United States. **ON BRIEF:**
Jennifer M. Valinski, LAW OFFICE OF PAUL S. BLUMENTHAL,
P.A., Annapolis, Maryland, for Appellants. Brian M. Peters, POST &

SCHELL, P.C., Philadelphia, Pennsylvania, for Appellees Upper Chesapeake Health, et al. J. Joseph Curran, Jr., Attorney General of Maryland, Baltimore, Maryland, for Appellee State of Maryland. Robert D. McCallum, Jr., Assistant Attorney General, Thomas M. DiBiagio, United States Attorney, Mark B. Stern, Alisa B. Klein, Appellate Staff, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee United States.

---

**OPINION**

WILKINSON, Chief Judge:

Dr. Linda Freilich is a physician. Harford Memorial Hospital decided to terminate Dr. Freilich's medical staff privileges after undertaking an extensive review of her application for reappointment. Dr. Freilich then filed a complaint challenging the constitutionality of the federal statute granting immunity to peer review participants and the Maryland physician credentialing statutes. In addition, Dr. Freilich alleged violations of both the Americans with Disabilities Act and the Rehabilitation Act and made various other common law claims. Dr. Freilich's complaint is an attempt to have a federal court supervise what amounts to little more than a physician-hospital dispute over hospital policies and the expenditure of hospital resources. We affirm the judgment of the district court dismissing her claims. *Freilich v. Bd. of Dir. of Upper Chesapeake Health, Inc.*, 142 F. Supp. 2d 679 (D. Md. 2001).

I.

Dr. Linda Freilich is a Board Certified Internist and Nephrologist who maintained unrestricted hospital privileges at defendant Harford Memorial Hospital (HMH), a private, non-profit hospital, from 1982 until April 12, 2000. During her tenure at HMH, Dr. Freilich states she advocated the rights of her patients in order to improve their quality of care. Specifically, Dr. Freilich complained that the outsourcing of quality assurance and oversight services for dialysis patients led to an improper standard of care.

Maryland state regulations require physicians to apply for reappointment every two years. *See* Code of Maryland Regulations (COMAR) § 10.07.01.24. During the reappointment process, each hospital must collect specific information about the physician applicant. The hospital then must analyze the physician's pattern of performance based upon seven factors, including "adherence to hospital bylaws, policies, and procedures" and "attitudes, cooperation, and ability to work with others." *Id.* Pursuant to COMAR regulations, HMH Medical Staff Bylaws provide that HMH will consider in the reappointment process "ethics and behavior in the Hospital, cooperation with Hospital personnel as it relates to patient care or the orderly operation of the Hospital, and general demeanor and attitude with respect to the Hospital, its patients and its personnel."

In July, 1998, Dr. Freilich applied for reappointment to HMH. Her application went through several layers of review, passing before the HMH Credentials Committee, the Medical Executive Committee, and the Appellate Review Committee. Further, Dr. Freilich received a hearing before the Ad Hoc Hearing Committee. Although the different committees disagreed on whether to accept or reject Dr. Freilich's application, on April 11, 2000, HMH's Board of Directors voted to deny Dr. Freilich's application and terminated her medical privileges. In a letter to Dr. Freilich explaining the basis for its decision, the Board quoted the "ethics and behavior" language in the HMH Bylaws.

On December 11, 2000, Dr. Freilich filed a 14-count, 76-page complaint against HMH and fourteen individuals who were involved in her peer review (collectively the "hospital defendants"), the State of Maryland, and the United States. The complaint alleged that HMH and its Board of Directors denied Dr. Freilich's application for reappointment because she did nothing more than advocate the rights of her patients. Specifically, Dr. Freilich alleged that the Health Care Quality Improvement Act (HCQIA), 42 U.S.C. § 11101 *et seq.*, which provides qualified immunity from damages to persons who participate in physician peer review, and the Maryland statute and regulations governing physician credentialing, Health-General Article § 19-319(e) and COMAR § 10.07.01.24(E), are all unconstitutional. She also brought a claim under 42 U.S.C. § 1983 against the hospital defendants, contending that the termination of her staff privileges violated her constitutional rights. Finally, Dr. Freilich alleged violations

of both the Americans with Disabilities Act (ADA) and the Rehabilitation Act (RA).

In an extensive opinion, the district court dismissed the federal claims with prejudice and the state law claims without prejudice. *Freilich v. Bd. of Dir. of Upper Chesapeake Health, Inc.*, 142 F. Supp. 2d 679 (D. Md. 2001). Dr. Freilich now appeals. We review a dismissal for failure to state a claim *de novo*, *Eastern Shore Mkts., Inc. v. J.D. Assoc. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000), and assume the facts as stated in the complaint are true. *See Jenkins v. Medford*, 119 F.3d 1156, 1159 (4th Cir. 1997) (en banc).

## II.

Dr. Freilich brings several constitutional challenges to the Health Care Quality Improvement Act, 42 U.S.C. § 11101 *et seq.* The HCQIA limits liability in damages for those who participate in professional peer review. For HCQIA immunity to attach, however, the peer review action must comport with due process. More specifically, the professional review action must be taken (1) "in the reasonable belief that the action was in the furtherance of quality health care;" (2) "after a reasonable effort to obtain the facts of the matter;" (3) "after adequate notice and hearing procedures are afforded;" and (4) "in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts." 42 U.S.C. § 11112. The HCQIA also sets forth detailed standards to ensure that a physician receives adequate notice and a hearing and exempts any claim alleging a civil rights violation or claims for declaratory or injunctive relief. *Id.*

## A.

We first address Dr. Freilich's due process and equal protection challenges to the HCQIA. Dr. Freilich first alleges that the HCQIA violates the Fifth Amendment because it "authorizes and encourages the Defendants [to] act irresponsibly in matters of credentialing, reappointment to the hospital staff, and wrongful denial of hospital privileges. . . ."[1] Because the HCQIA does not burden any fundamental

___

[1]Dr. Freilich argues that her challenge arises under the Fourteenth Amendment. The HCQIA is a federal law. Dr. Freilich's due process and

right or draw distinctions based on any suspect criteria, it is subject only to rational basis review. Rational basis review is "a paradigm of judicial restraint," *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 314 (1993), which prohibits us from "sit[ting] as a super-legislature to judge the wisdom or desirability of legislative policy determinations." *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) (per curiam). According a strong presumption of validity to the HCQIA, we thus need only determine whether the HCQIA is rationally related to a legitimate governmental purpose. *See Beach Communications*, 508 U.S. at 314-15 (1993).

The legitimacy of Congress's purpose in enacting the HCQIA is beyond question. Prior to enacting the HCQIA, Congress found that "[t]he increasing occurrence of medical malpractice and the need to improve the quality of medical care . . . [had] become nationwide problems," especially in light of "the ability of incompetent physicians to move from State to State without disclosure or discovery of the physician's previous damaging or incompetent performance." 42 U.S.C. § 11101. The problem, however, could be remedied through effective professional peer review combined with a national reporting system that made information about adverse professional actions against physicians more widely available. However, Congress also believed that "[t]he threat of private money damage liability under Federal laws, including treble damage liability under Federal antitrust law, unreasonably discourage[d] physicians from participating in effective professional peer review." *Id.* Congress therefore enacted the HCQIA in order to "facilitate the frank exchange of information among professionals conducting peer review inquiries without the fear of reprisals in civil lawsuits. The statute attempts to balance the chilling effect of litigation on peer review with concerns for protecting physicians improperly subjected to disciplinary action." *Bryan v. James E. Holmes Regional Med. Ctr.*, 33 F.3d 1318, 1322 (11th Cir. 1994).

Dr. Freilich's complaint lists seventeen alleged defects with the statute, such as permitting hearsay during the hearing proceedings and

equal protection challenges therefore more properly arise under the Fifth Amendment. *See Int'l Sci. & Tech. Inst., Inc. v. Inacom Communications, Inc.*, 106 F.3d 1146, 1156 (4th Cir. 1997).

permitting the denial of privileges when there are no findings of incompetent behavior by the physician. Apparently, she would like this court to rewrite the HCQIA. Opinions may differ on what is the most effective way to improve the quality of our nation's health care system. However, we cannot substitute our judgment, or that of Dr. Freilich, for Congress's rationally based belief that the HCQIA is an effective means to achieve its goal. *See Heller v. Doe*, 509 U.S. 312, 333 (1993).

B.

The HCQIA adopts an objective reasonableness test. As noted earlier, the HCQIA only applies if a peer review action is taken in the reasonable belief that the action was taken (1) after a reasonable effort to obtain the facts; (2) after adequate notice and hearing procedures are afforded the physician involved; (3) in the reasonable belief that the action was warranted by the facts; and (4) in the reasonable belief that the action was in the furtherance of quality health care. 42 U.S.C. § 11112(a), (b). The standard, then, is one of objective reasonableness after looking at the "totality of the circumstances." *Imperial v. Suburban Hospital Assoc.*, 37 F.3d 1026, 1030 (4th Cir. 1994).

Dr. Freilich alleges that the HCQIA is unconstitutionally vague in violation of the Due Process Clause. She contends that the HCQIA reasonableness standard governing peer review immunity "authorizes, encourages, and permits HMH to act with impunity" because the "HCQIA does not specify what constitutes 'reasonable belief.'"

Dr. Freilich's vagueness challenge is an odd one. To begin with, the HCQIA reasonableness standard does not even apply to Dr. Freilich's own conduct. Rather, it is a standard that a peer review body must meet in order to obtain immunity for its actions.

And the HCQIA's objective reasonableness standard is a perfectly valid guide for peer review bodies. The "reasonable belief" standard embodies the discretion that health care professionals have traditionally exercised in determining whether or not their peers meet a requisite level of professional competence. *See, e.g., Doyle v. Bowen*, 660 F. Supp. 1484 (D. Me. 1987), *vacated on other grounds*, 848 F.2d 296 (1st Cir. 1988). Courts respect this discretion because "[a]ny attempt

to catalog every medical practice that would fall into the prohibited category would result in the sort of encyclopedic and unwieldy statute [already] rejected as unnecessary." *Id.* at 1493. *See also*, *Assoc. of Am. Physicians and Surgeons v. Weinberger*, 395 F. Supp. 125, 138 (N.D. Ill. 1975) (noting the difficult task of "drafting [a] . . . statute with sufficient specificity to give the physicians, practitioners and providers of health care service adequate notice of the new requirements of the law and at the same time to maintain enough flexibility to cover a variety of medical cases").

Furthermore, reasonableness standards have been consistently upheld in the context of qualified immunity. *See, e.g., Trulock v. Freeh*, 275 F.3d 391, 399 (4th Cir. 2001) ("Qualified immunity shields government officials from civil liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'") (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In cases brought under 42 U.S.C. § 1983, courts commonly apply an objective reasonableness standard to afford public officers sufficient latitude to properly perform discretionary functions. *See, e.g., Gooden v. Howard County*, 954 F.2d 960, 964 (4th Cir. 1992) (en banc). We therefore hold that the HCQIA reasonableness standard provides sufficient guidance to withstand a vagueness challenge.

## C.

Dr. Freilich next alleges that the HCQIA violates the Tenth Amendment of the United States Constitution and Article Three of the Maryland Declaration of Rights by "invad[ing] subjects traditionally governed by state law," and by "attempting to immunize conduct otherwise actionable under state law."[2]

The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. A Tenth Amendment inquiry consists of two parts.

---

[2]We construe "guarantees in the Declaration of Rights to be in *pari materia* with similar provisions of the federal constitution." *Patterson v. Maryland*, 741 A.2d 1119, 1128 (Ct. App. Md. 1999).

First we must determine whether Congress has the constitutional power to enact the HCQIA. *United States v. Johnson*, 114 F.3d 476, 480 (4th Cir. 1997) (citing *New York v. United States*, 505 U.S. 144 (1992)). If we answer this inquiry in the affirmative, we then ask whether the means of regulation employed by Congress impermissibly infringe upon state sovereignty. *Id.*

Congress has the power under the Commerce Clause to enact statutes governing physician peer review. Hospitals are regularly engaged in interstate commerce, performing services for out-of-state patients and generating revenues from out-of-state sources. *Summit Health, Ltd. v. Pinhas*, 500 U.S. 322, 329-30 (1991). And the Supreme Court has already held that because "[r]eports concerning peer review proceedings are routinely distributed across state lines and affect doctors' employment opportunities throughout the Nation," there is "no doubt concerning the power of Congress to regulate a peer review process." *Id.* at 327-28, 332.

Having found that Congress has the power to enact the HCQIA, we now ask whether the means employed infringe upon state sovereignty. *Johnson*, 114 F.3d at 480. We hold that they do not. The HCQIA does not commandeer the state legislature or executive. "It does not require . . . [the Maryland Legislature] to enact any laws or regulations, and it does not require state officials to assist in the enforcement of federal statutes regulating private individuals." *Reno v. Condon*, 528 U.S. 141, 151 (2000). The HCQIA does not compel states to implement a federal regulatory program either. Under the HCQIA, health care providers are required to collect and report information to the State Board of Medical Examiners. *See* 42 U.S.C. § 11133(a). The State Board of Medical Examiners then forwards that information to a federal data bank. But more is required than the expenditure of time and effort on the part of state officials in order to offend the Tenth Amendment. *See Condon*, 528 U.S. at 150. "Any federal regulation demands compliance. That a State wishing to engage in certain activity must take administrative and sometimes legislative action to comply with federal standards regulating that activity is a commonplace that presents no constitutional defect." *South Carolina v. Baker*, 485 U.S. 505, 514-15 (1988).

All that the HCQIA requires of states is the forwarding of information. And the HCQIA specifically provides that "nothing in this part

shall be construed as changing the liabilities or immunities under law or as preempting or overriding any State law which provides incentives, immunities, or protection for those engaged in a professional review action that is in addition to or greater than that provided by this part." 42 U.S.C. § 11115. We thus agree with the district court's conclusion that the HCQIA "does not require the state to do anything that the state itself has not already required, authorized, or provided by its own legislative command." *Freilich*, 142 F. Supp. 2d at 696. In sum, the HCQIA does not come close to offending the Tenth Amendment.

## III.

We next turn to Dr. Freilich's claims against the hospital under Titles II and III of the Americans with Disabilities Act (ADA) and under the Rehabilitation Act (RA).[3] To the extent possible, we construe similar provisions in the two statutes consistently. *See Ennis v. Nat'l Ass'n of Bus. and Educ. Radio, Inc.*, 53 F.3d 55, 57 (4th Cir. 1995). Dr. Freilich makes three claims, which we address in turn.

## A.

Dr. Freilich brings her first ADA claim on behalf of her dialysis patients. Dr. Freilich alleges that HMH violated the ADA and the RA by providing in-hospital quality assurance and oversight for all hospital services provided by contractors except for dialysis services. *See*

---

[3]Dr. Freilich also brings a section 1983 claim against the hospital defendants based on their decision to terminate her hospital privileges. The hospital defendants are all private actors. Therefore in order to properly bring a section 1983 claim against them, Dr. Freilich must not only demonstrate that a constitutional violation occurred, but must also show that their actions can be properly characterized as those of the state. *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999). The Maryland credentialing statute and regulation both require hospitals to establish a formal reappointment process. But the State plays no role whatsoever in the actual decision as to whether or not to terminate or reappoint any particular physician. Because the private hospital defendants cannot properly be considered state actors, Dr. Freilich's section 1983 claim is dismissed.

42 U.S.C. §§ 12132, 12182; 29 U.S.C. § 794. Quality assurance and oversight for dialysis services is provided by an outside contractor. We do not reach the merits of this claim, however, because Dr. Freilich lacks standing to bring such a claim on behalf of her patients.

Our standing inquiry "involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). Even if a plaintiff satisfies Article III standing requirements, "[f]ederal courts must hesitate before resolving a controversy, even one within their constitutional power to resolve, on the basis of the rights of third persons not parties to the litigation." *Singleton v. Wulff*, 428 U.S. 106, 113 (1976). To overcome the prudential limitation on third-party standing, a plaintiff must demonstrate: (1) an injury-in-fact; (2) a close relationship between herself and the person whose right she seeks to assert; and (3) a hindrance to the third party's ability to protect his or her own interests. *Powers v. Ohio*, 499 U.S. 400, 410-11 (1991).

The district court held that even assuming the existence of the first two elements, Dr. Freilich did not sufficiently allege a hindrance to her patients' ability to protect their own interests. *Freilich*, 142 F. Supp. 2d at 699. Here Dr. Freilich fails to allege sufficient obstacles to the patients bringing suit themselves. The district court correctly pointed out that "the dialysis patients and indigent patients on whose behalf Dr. Freilich advocated are not constrained in bringing suit by any obstacles made known in the Complaint." *Freilich*, 142 F. Supp. 2d at 699. In her submission to this court, Dr. Freilich argues that dialysis patients are disabled and chronically ill, foreclosing them from presenting their own rights. But we cannot simply assume that every disabled or chronically ill person is incapable of asserting his or her own claims. In fact, such persons are typical and frequent plaintiffs under both the ADA and RA. Faced, then, with no evidence that Dr. Freilich's dialysis patients are hindered from presenting their own claims, we adhere to the longstanding principle that "third parties themselves usually will be the best proponents of their own rights." *Singleton*, 428 U.S. at 114.

### B.

Next, Dr. Freilich asserts a claim of associational discrimination under the ADA. *See* 42 U.S.C. § 12182(b)(1)(E). Dr. Freilich alleges

that HMH denied her reappointment because of her "patient advocacy." Under Title III of the ADA, 42 U.S.C. § 12182(b)(1)(E), it is discriminatory to "exclude or otherwise deny equal goods, services, facilities, privileges, advantages, accommodations, or other opportunities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association." There is little case law applying this provision. We therefore look for guidance from a similar provision in Title I of the ADA which governs associational discrimination in employment. *See* 42 U.S.C. § 12112(b)(4).

The associational discrimination provision in Title I "was intended to protect qualified individuals from adverse job actions based on 'unfounded stereotypes and assumptions' arising from the employees' relationships with particular disabled persons." *Oliveras-Sifre v. Puerto Rico Dept. of Health*, 214 F.3d 23, 26 (1st Cir. 2000) (citing *Barker v. Int'l Paper Co.*, 993 F. Supp. 10, 15 (D. Me. 1998)). In *Oliveras-Sifre*, the plaintiffs alleged that they were punished for their advocacy on behalf of AIDS patients. However, the First Circuit rejected the plaintiffs' contention that the defendants' actions violated the associational discrimination provision of the ADA. The plaintiffs did not allege "a specific association with a disabled individual." Instead, they "contend[ed], in essence, that they were punished for their advocacy on behalf of individuals with AIDS." *Id.* In *Barker*, the court granted summary judgment in favor of the defendants along the same lines: the plaintiff alleged that he was terminated because of his advocacy on behalf of the plaintiff's disabled wife, which was held insufficient to support an associational discrimination claim. 993 F. Supp. at 15.

Dr. Freilich's allegations suffer from similar defects as the allegations in *Oliveras-Sifre* and *Barker*. Dr. Freilich alleges that HMH "coerced, intimidated, threatened, or interfered . . . with [her] because she exercised rights protected by the ADA," and that HMH discriminated against her because she refused "to end her advocacy of the dialysis patients' rights that were being violated under [the] ADA." She further alleges that she was "denied equal use of facilities, privileges, advantages or other opportunities because of her association with and her relationship to patients with disabilities." But such generalized references to association with disabled persons or to advocacy for a

group of disabled persons are not sufficient to state a claim for associational discrimination under the ADA. Every hospital employee can allege at least a loose association with disabled patients. To allow Dr. Freilich to proceed on such a basis would arm every hospital employee with a potential ADA complaint. A step of that magnitude is for Congress, not this court, to take.

### C.

Finally, Dr. Freilich brings a claim for retaliatory discharge under the ADA and the RA. She alleges that HMH terminated her hospital privileges "because she strongly opposed and voiced her concerns about HMH's practices in treating dialysis patients." Specifically, Dr. Freilich contends that her opposition to HMH's decision to outsource quality oversight and quality assurance over dialysis services constitutes protected conduct under the ADA. Under 42 U.S.C. § 12203, "[n]o person shall discriminate against any individual because such individual has opposed any act or practice *made unlawful by this chapter* or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." (emphasis added). In order to establish a prima facie case of retaliation, a plaintiff must allege (1) that she has engaged in conduct protected by the ADA; (2) that she suffered an adverse action subsequent to engaging in the protected conduct; and (3) that there was a causal link between the protected activity and the adverse action. *Rhoads v. FDIC*, 257 F.3d 373, 392 (4th Cir. 2001). In reviewing retaliation claims, courts recognize the need to balance the desire to encourage employees to oppose unlawful discrimination, with "an employer's interest in maintaining a harmonious, productive and loyal workforce." *Fitch v. Solipsys Corp.*, 94 F. Supp. 2d 670, 678 (D. Md. 2000).

A plaintiff need not establish that the conduct she opposed actually constituted an ADA violation. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 357 n.1 (4th Cir. 1985). But a complainant must allege the predicate for a reasonable, good faith belief that the behavior she is opposing violates the ADA. *E.g.*, *Weissman v. Dawn Joy Fashions, Inc.*, 214 F.3d 224, 234 (2nd Cir. 2000).

In her complaint, Dr. Freilich alleges what at most are violations of state medical malpractice law, not infractions of the ADA. Dr. Freilich says that she complained orally and/or in writing regarding the failure to transport a patient in a timely manner; the failure to adhere to skin protocols; the failure to address concerns regarding uncertified nurses; the failure to diagnose a cervical fracture on a patient; the unsupervised dialysis of a patient; and the failure to provide correct dialysis services for several patients. While we do not overlook the importance of maintaining adequate levels of patient care, it is not the job of a federal court under the ADA to referee disagreements between a hospital and staff physician over what constitutes the appropriate funding or manner of such care. In essence, Dr. Freilich disagrees with the level of care being provided to some hospital patients, which she attributes to the outsourcing of quality assurance and quality oversight for dialysis patients.[4] She could not, however, reasonably believe that her disagreement with HMH over the expenditure of hospital resources constituted a violation of the ADA.

Every disagreement over the adequacy of hospital expenditures or the provision of patient care is not an ADA issue. If it were, courts would be drawn into medical resource disputes quite beyond their expertise and hospital personnel would be diverted by litigation from their primary task of providing medical attention to those in their charge. Hospitals are in the business of serving persons with many kinds of disabilities, and we have noted that "our federal disability statutes are not designed to ensure that persons with one type of disability are treated the same as persons with another type of disability." *Lewis v. Kmart Corp.*, 180 F.3d 166, 171-72 (4th Cir. 1999). Recognizing that the medical community is best equipped to conduct the balancing that medical resource allocations inevitably require, Congress declined to give courts a mandate to arbitrate such disputes.

---

[4]It is not even clear that the provision of in-house quality assurance and quality oversight is a good, service, or advantage under the ADA. Rather, as the district court noted, quality assurance and oversight "seems more to be a service rendered to the hospital and practitioners." *Freilich*, 142 F. Supp. 2d at 702.

Because Dr. Freilich has failed to allege any set of facts supporting her claim that she opposed practices made unlawful by the ADA, we affirm the district court's dismissal of her retaliation claim.

IV.

We turn finally to Dr. Freilich's due process challenge to the Maryland statute and regulation which govern the credentialing process.

Maryland Code Health-General Article § 19-319(e) governs the hospital credentialing process for physicians. Under the statute, hospitals must establish a credentialing process for physicians who are employed by or have staff privileges at the hospital. The statute further requires the Secretary of Health and Mental Hygiene to establish minimum standards for a credentialing process, which must include, among other things, a formal, written reappointment process to be conducted at least every two years. The reappointment process must document the physicians' pattern of performance by "analyzing claims filed against the physician, data dealing with utilization, quality, and risk, a review of clinical skills, adherence to hospital bylaws, policies and procedures, compliance with continuing education requirements, and mental and physical status." *Id.*

Pursuant to § 19-319(e), COMAR § 10.07.01.24(E) requires each hospital in the state of Maryland to establish a process for the reappointment of physicians. As part of the reappointment process, hospitals must "collect, verify, review, and document" the physicians' pattern of performance based on an analysis of the following: "(i) claims filed against the physician; (ii) utilization, quality and risk data; (iii) a review of clinical skills; (iv) adherence to hospital bylaws, policies, and procedures; (v) compliance with continuing medical education requirements; (vi) an assessment of current mental and physical health status; and (vii) attitudes, cooperation, and ability to work with others." *Id.*

Dr. Freilich alleges that Maryland's credentialing regulation, COMAR § 10.07.01.24(E), violates due process. Specifically, Dr. Freilich alleges that she was deprived of "her liberty to practice her chosen profession in the locale where she has practiced for 18 years" because "Health-General Article, § 19-319 and the COMAR regula-

tion § 10.07.01.24(E) permit Hospital administrators to deny hospital privileges based solely upon the vague, ambiguous, and subjective 'attitude' criterion."

The statute and regulation will survive a vagueness challenge so long as each provides physicians with reasonable notice as to the type of conduct that may cause a denial of their hospital privileges. *See Village of Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 498-99 (1982). As we pointed out earlier, a provision cannot particularize every different set of facts and circumstances that might lead a peer review committee to conclude that a physician's privileges should be terminated. Hospitals have historically had wide discretion to make decisions regarding their medical staff. *See, e.g., Glass v. Doctors Hosp., Inc.*, 131 A.2d 254 (Md. 1957). "The governing board of a hospital must[ ] be given great latitude in prescribing the necessary qualifications for potential applicants." *Woodbury v. McKinnon*, 447 F.2d 839, 845 (5th Cir. 1971). This includes the consideration of factors beyond technical medical skills. *Schlein v. Milford Hosp.*, 423 F. Supp. 541, 544 (D. Conn. 1976) ("Due process does not limit the hospital's consideration to technical medical skills.").

Dr. Freilich's vagueness argument would lead the uninformed observer to believe that a Maryland hospital can terminate a physician's privileges solely on a subjective determination that the physician had a bad attitude. This is untrue. Dr. Freilich ignores the fact that the COMAR regulation requires hospitals to assess a physician's pattern of performance based upon seven separate factors. The regulation does not authorize or encourage private "hospitals to terminate a physician's privileges solely because of his/her '[a]ttitudes, cooperation, and ability to work with others.'" Complaint ¶ 89. By its own terms, the regulation requires hospitals to employ a broad based, formal written reappointment process that considers numerous criteria. COMAR § 10.07.01.24(E)(3)(b).

Furthermore, most courts that have considered the use of criteria such as attitude and cooperation in a hospital's reappointment decisions have refused to interfere with the discretion given to hospitals over substantive credentialing decisions, so long as those criteria are not applied arbitrarily. For example, in *Sosa v. Board of Managers of the Val Verde Memorial Hospital*, 437 F.2d 173 (5th Cir. 1971), the

Fifth Circuit considered a constitutional challenge to the Val Verde Memorial Hospital Credential Committee's use of "character, qualifications, and standing" in reviewing applicants seeking admission to the hospital medical staff. *Id.* at 176 (internal citation omitted). The court admitted that "standards such as 'character, qualifications, and standing' are very general, but . . . recognize[d] that in the area of personal fitness for medical staff privileges precise standards are difficult if not impossible to articulate. The subjectives of selection simply cannot be minutely codified. The governing board of a hospital must therefore be given great latitude in prescribing the necessary qualifications for potential applicants." *Id.* Because "[n]o court should substitute its evaluation of . . . [professional competency] for that of the Hospital Board," our review is limited to "assuring that the qualifications imposed by the Board are reasonably related to the operation of the hospital and fairly administered." *Id.* at 177.

The Fifth Circuit is hardly alone in its view. Courts across the country have upheld bylaws employing similar factors as Maryland's regulation. *Freilich*, 142 F. Supp. 2d at 689. In *Yashon v. Hunt*, 825 F.2d 1016 (6th Cir. 1987), the Sixth Circuit held that "a physician's unprofessional conduct, incompatibility and lack of cooperation on a hospital staff are appropriate considerations for denying staff privileges." *Id.* at 1027 (citing *Stretten v. Wadsworth Veterans Hosp.*, 537 F.2d 361, 368 (9th Cir. 1976)). *See also Mahmoodian v. United Hosp. Center, Inc.*, 404 S.E.2d 750, 758 (W. Va. 1991) (finding "an ability to work with others" a "reasonably definite standard proscribing the conduct upon which the [clinical privileges] revocation or other adverse action is based"). Today's health care environment has become increasingly complex. As Dr. Freilich's complaint itself demonstrates, the operation of a hospital requires the coordination of numerous employees and departments, each with different responsibilities that build and depend upon each other. Thus, staff cooperation and communication are essential to ensuring a high quality of patient care. Disruptive behavior in the workplace can not only affect the morale and teamwork of the staff itself, but in so doing cause actual harm to patients. A hospital's evaluation of a physician's attitude and ability to work with others is not unduly vague and is directly related to the goal of good patient care. Accordingly, we reject Dr. Freilich's challenge to Maryland's physician credentialing system.

## V.

Dr. Freilich's complaint invites courts to enmesh themselves in hospital governance. Both Congress and the Maryland legislature have proceeded in precisely the opposite direction, affording hospital authorities both the discretion and the protection to discharge their assigned tasks. We decline to interfere with these legislative judgments and affirm the judgment of the district court dismissing plaintiff's claims.

*AFFIRMED*